UNITED STATES of America, Plaintiff-Appellee,

v.

Gary G. DYER, Defendant-Appellant.

No. 84–2430.

United States Court of Appeals, Seventh Circuit.

Argued June 14, 1985.
Decided Feb. 26, 1986.

David L. DeBruin, Law Offices of Stephen E. Kravit, Milwaukee, Wis. for defendant-appellant.

Thomas J. Scorza, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER and WOOD, Circuit Judges, and GRANT, Senior District Judge.[*]

GRANT, Senior District Judge.

Defendant-appellant, Dyer, appeals his conviction, in a bench trial, of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). Dyer received a sentence of five years' imprisonment, to be followed by a five year special parole term. Dyer filed a timely notice of appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the conviction.

### Facts

On February 7, 1984, Drug Enforcement Administration [hereinafter referred to as DEA] agents Behrmann and Labik were monitoring incoming flights in the baggage claim area at Chicago's O'Hare Airport. While questioning a passenger from Delta Airlines' non-stop Flight 458 from Fort Lauderdale, they observed Dyer descending the escalator to the baggage claim area. Few Flight 458 passengers remained in the area. Approximately six bags from that flight lay on the baggage carousel.

Dyer appeared unkempt. He was wearing a sweater and blue jeans in slight disarray. He drew the agents' attention to himself when he seemed to look at them for an unusually long time. Empty-hand-

[*] The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

ed, he walked past the carousel, then returned. Meanwhile, the agents had concluded their interview with the other passenger. They walked away from the baggage claim area, through the sliding glass door at the exit, and stopped in the foyer. From there, they saw Dyer survey the baggage on the carousel, claim a small shoulder bag, pick up a second beige bag, look at it, and replace it on the carousel. Dyer then picked up a third maroon bag.

The agents entered the airport and approached Dyer. They identified themselves as federal agents and asked to speak with him, but Dyer kept walking toward the sliding glass doors at the exit. Following him into the foyer, the agents again addressed him in a louder but conversational voice, identifying themselves and asking him if they could speak with him. Dyer stopped, turned around to face the agents, and said, "Hello." They asked to see his airline ticket and some identification.

During this time, people were passing through the foyer. While Dyer was producing his identification, the agents noticed that his hands were trembling. He dropped his identification. His voice quivered. He seemed upset and nervous.

His airline ticket revealed a round-trip fare from Chicago to Fort Lauderdale made out to J. Williams. The flight had departed Chicago the night before at 9:05, and returned from Fort Lauderdale that afternoon. Dyer's other identification consisted of an American Express card, a Blue Cross-Blue Shield membership card, an identification card from GTE Automatic Electric, a bail bond card, and a medical emergency card, all in the name of James Williams. Dyer did not have a driver's license or any identification bearing his picture. Agent Behrmann looked at the documents and passed them to Agent Labik, who gave them back to Dyer. They saw the name James Williams on the tags of his luggage.

In the ensuing conversation, Dyer told the agents that he had gone to Florida to look at some horses at the Hialeah Race Track. He said that he was a part-time horse trainer. Agent Behrmann asked Dyer if he would consent to the agents looking into his bags. He replied by asking if he was under arrest. Agent Behrmann said no and repeated his request. He told Dyer that he did not have to consent to the search and that he need not stay. Dyer answered, "I have nothing to hide. Go ahead and look."

The agents thought Dyer seemed extremely nervous. His hands continued to shake. His voice was getting louder. The agents did not display weapons or touch Dyer or block his way. They proceeded to search the two bags. In the center of the maroon bag, the agents discovered a tape-sealed brown cardboard box. When asked what it was, Dyer said it was a car fuel injection kit which he had brought back from Florida. Agent Labik asked Dyer for consent to open the box and look inside. He told Dyer that he did not have to consent, but Dyer said "Yes, you can look in the box."

Agent Labik found a white box within the brown cardboard box. Inside the white box he found a one gallon-size black can. A metal band fastened by a screw encircled the can. It felt heavy. After removing the cap to the can, the agent saw that it was stuffed full of newspaper. He removed the newspaper and saw a clear plastic bag containing a white powder. Agent Labik then informed Dyer that he was under arrest and read him his rights. A field test showed that the white powder was cocaine.

The agents took Dyer to the DEA office for processing. He eventually told them that his real name was Gary Dyer, that he had a previous arrest in Milwaukee for delivering a pound of cocaine, and that he had been stopped in Fort Lauderdale that afternoon before boarding his flight. The Fort Lauderdale police had not communicated this stop to the Chicago agents.

On February 17, 1984, the Grand Jury issued a one-count indictment charging Gary Dyer with possession with intent to distribute approximately 233.8 grams of a cocaine mixture. After a hearing on June 15, 1984, the district judge denied Dyer's

Motion to Suppress the cocaine found in Dyer's luggage. Based upon the stipulated evidence of the testimony of the two DEA agents at the suppression hearing, the district judge, in a bench trial, found Dyer guilty as charged. He later sentenced Dyer to five years' imprisonment, followed by a five year special parole term.

Dyer raises three issues on appeal:

I. Whether he was seized within the meaning of the Fourth Amendment;

II. Whether he consented to a search of his luggage; and,

III. Whether he was denied effective assistance of counsel at the suppression hearing?

Issue I. *Whether he was seized within the meaning of the Fourth Amendment?*

In denying Dyer's Motion to Suppress the cocaine, the district court found that the defendant consented to stop and talk with the DEA agents. In general, the district judge determines the credibility of witnesses in motions to suppress. We apply the "clearly erroneous" standard to these determinations. *United States v. Hendrix,* 752 F.2d 1226, 1230 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985) (citations omitted).

■ Considerable confusion exists regarding consensual questioning, investigatory stops and full-blown arrests. Both of the latter involve "seizures." However, if, in the totality of the circumstances, a reasonable person would not believe that his freedom of movement is restrained, or believes that he remains at liberty to disregard a police officer's request for information, a seizure has not occurred. The officer need not justify such an encounter because no constitutional interest is implicated. *United States v. Borys,* 766 F.2d 304, 309 (7th Cir.) (citing *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *United States v. Morgan,* 725 F.2d 56, 59 (7th Cir.1984)), *cert. denied,* —— U.S. ——, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986).

■ When the agents spoke to Dyer, he was walking out of the terminal. He stopped of his own volition. The officers told him that he could leave and that he could refuse to give his consent to the search. They questioned him where he stopped. *Morgan* involved a similar encounter. Defendant Morgan was standing in a foyer at O'Hare airport when two DEA agents approached her. After identifying themselves, the agents told Morgan that she fit the profile of a drug courier and asked her to move away from the flow of traffic and into another area. She complied. After being told that she could refuse their request to search her bags, Morgan consented. Following a second consent and second search, the agents found cocaine. While the fact that she was told she had the right to refuse the search was not dispositive of the determination of voluntariness, this Court found it to be highly relevant; and, under the circumstances, we did not find the indicia of a seizure. *Morgan,* 725 F.2d at 58.

Like Morgan, the agents told Dyer he could refuse to consent; yet he agreed to the search. Unlike Morgan, the agents never attempted to displace Dyer from where he stopped. They exercised minimal control over him. The district court properly found that this encounter was not a seizure.

■ Likewise, Dyer's encounter never ripened into an investigative stop, for which the officers would have needed a reasonable, articulable suspicion. Unlike the agents in *United States v. Cordell,* 723 F.2d 1283, 1285 (7th Cir.1983), *cert. denied,* 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984), who kept the defendant's driver's license and airline ticket while telling him they were conducting a narcotics investigation, Agents Behrmann and Labik returned Dyer's identification to him. Nothing indicates that this encounter rose above mere approaching and questioning.

[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions,

by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.... Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification.

*Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (citations omitted). We agree with the district court that this encounter was not a seizure and did not violate the provisions of the Fourth Amendment.

Issue II. *Whether Dyer consented to a search of his luggage?*

The district court found that Dyer expressly consented to a search of his luggage and of the tape-sealed brown cardboard box, after being told that he could refuse the search and that he might leave. Dyer contends that any consent he gave was tainted and should have been suppressed because he gave it during an unjustified investigatory detention. He also argues that his consent was not freely given because of the intimidating and coercive circumstances of his encounter. Finally, Dyer maintains that even if his consent was voluntary, it did not extend beyond the suitcase and the first brown cardboard box. We reject these arguments, as did the district court, and address only Dyer's third contention.[1]

■ Dyer would have his consent to be searched extend only to the bag and the first sealed brown cardboard box, but not to the white box containing the cocaine can. Clearly a person may limit or withdraw his consent to a search, and the police must honor such limitations. But, where a suspect does not withdraw his valid consent to a search for illegal substances before they are discovered, the consent remains valid and the substances are admissible as evidence. *See United States v. Black*, 675 F.2d 129 (7th Cir.1982), *cert. denied*, 460

U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). The consent to search luggage validates the search both of the luggage and of containers within the luggage. We have sanctioned evidence obtained from such a search. *See Morgan*, 725 F.2d at 58.

Upon review of all the circumstances of Dyer's encounter with the agents, the district court did not err in finding that he expressly consented to the search of his bags. In fact, the agents asked Dyer a second time during the search for permission to search the cardboard box, and he repeated his consent. In both instances, he consented voluntarily and with no limitation. A more explicit consent to be searched could hardly be found. We, therefore, uphold the district court's finding that Dyer consented to the search of his luggage and its contents.

Issue III. *Whether Dyer was denied effective assistance of counsel at the suppression hearing?*

■ Dyer raises for the first time on appeal the claim of ineffective assistance of counsel. Although we have expressed a preference for the district court to consider ineffective assistance of counsel claims, we recognize the discretion of the Court of Appeals to resolve this issue when raised for the first time on appeal. *United States v. Brown*, 739 F.2d 1136, 1145 (7th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984). We consider this case appropriate for resolution at the appellate level because it leaves no doubt as to how this issue should be resolved. *Id.*

The Supreme Court has articulated a two-pronged analysis to show ineffective assistance of counsel: the defendant must show that his counsel's performance was deficient, that is, below an objective standard of reasonableness, and second, the defendant must affirmatively prove that he was prejudiced by the alleged incompetence. The reviewing court need not address these two considerations in any par-

---

1. In Part I, we concluded that Dyer's encounter with the agents was not a seizure. It would be illogical to find the same circumstances to be coercive regarding his consent to search but not for a seizure. Thus, Dyer's first two arguments fail.

ticular order or even address both points if the defendant makes an insufficient showing on one. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh'g denied*, — U.S. —, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984).

Dyer claims that his counsel was ineffective because he did not advise him of his right to testify and in fact advised him not to testify. He criticizes his counsel's failure to elicit testimony regarding his encounter with the police in Fort Lauderdale. He argues that his counsel should have pointed out inconsistencies in the agents' testimony during his closing argument.

 Whether or not a defendant should take the stand is a tactical choice of trial strategy. A reviewing court may only consider those acts or omissions of an attorney that are not classifiable as an attorney's tactics. *Arrowood v. Clusen*, 732 F.2d 1364, 1369 (7th Cir.1984) (citations omitted). Dyer chose not to testify upon the advice of his counsel. We will not review that decision.

Contrary to Dyer's allegation, his counsel did address the Fort Lauderdale encounter in his cross-examination of Agent Labik. Record at 114. The record further reveals that Dyer's counsel energetically represented him. His cross-examination of Agent Behrmann extends to thirty-five pages in the record, plus a re-cross of three more pages. When the court called Agent Labik to testify, Dyer's counsel objected. When overruled, his counsel mustered a cross-examination which comprises ten pages of the record. In his opening statement, Dyer's counsel advanced both his theory that Dyer's detention was an arrest without probable cause at the airport, and his theory that even if Dyer consented to a search of his luggage, it did not extend to a search of the can containing the cocaine. In his final argument Dyer's counsel attempted to refute and distinguish each case which the prosecution had cited in its closing argument. Dyer's claim of ineffective assistance of counsel fails to meet the first prong of the *Strickland* test—his counsel's performance was not deficient. Dyer's claim must fail.

### Conclusion

The decision of the district court is AFFIRMED.