**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Richard W. NOVAK and Hugo Leon, Defendants–Appellants.**

**Nos. 88–2562, 88–2563.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1989.

Decided March 29, 1989.

Catherine M. Canright, William S. Mautner, Atinsky Kahn Sicula & Teper, Milwaukee, Wis., for defendants-appellants.

Eric J. Klumb, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before WOOD, Jr., POSNER, and MANION, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

To quote the district judge, "[T]his is not a venture of which law enforcement might be proud." Except for the regrettable performance of the officers this should have been a routine narcotics investigation. It happened at Mitchell International Airport in Milwaukee, Wisconsin, when the two defendants, Richard W. Novak and Hugo Leon, arrived together from Miami.

Both defendants Novak and Leon were arrested at the airport and later jointly charged with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, possession of approximately one kilogram of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1), and interstate travel in aid of a cocaine enterprise in violation of 18 U.S.C. § 1952(a)(3). Defendant Novak sought a severance anticipating inconsistent defenses. Defendant Leon moved to suppress the cocaine evidence seized from his duffle bag at the airport, as well as certain statements he made at the time. Those motions were heard by the magistrate who recommended that the district court deny the motions, which the district court did after taking additional evidence on defendant Leon's motion to suppress. A jury trial resulted in verdicts of guilty on all counts.[1] The district court rulings on those motions constitute the issues on appeal.

## FACTUAL BACKGROUND [2]

On April 26, 1988, while awaiting sentencing in another drug related case, Fausto Zaffino provided the government with a tape recording of a conversation he had just had with Novak the preceding evening.

---

1. Defendant Novak was sentenced to ten years imprisonment and defendant Leon to five years imprisonment concurrently on all counts.

2. The factual summary is compiled from the suppression hearing and the trial, and where there is an evidentiary dispute it is so indicated.

The conversation revealed that Novak was flying to Miami the next day to return with cocaine sometime later. Novak's comments suggested that he might have company, whom he did not name, on the trip. In discussing past trips Novak mentioned a "Tom" and a "Hugo." Zaffino placed an order with Novak for a kilogram of cocaine. Novak declined to reveal to Zaffino the time of his anticipated return, as, he explained, he did not have a liking for airport surprises. However, there would be one anyway. Further, Novak suggested that he might even drive back from Miami if the unnamed person's car had been repaired.

Reacting to information from Zaffino's tape, Special Agent Kerry Hadaway of the FBI checked with an airline and determined that Novak flew to Miami as he had said he would, and was to return to Milwaukee the following day at 5:15 P.M. It was also determined that the seat next to Novak on the return flight was reserved in the name of Hugo Leon. Preparations began for a surprise welcoming committee of FBI agents, U.S. Drug Enforcement Administration (DEA) agents, City of Milwaukee police officers, and Milwaukee County Sheriff's officers.

When the two defendants left the plane together in Milwaukee they were followed by officers, but not stopped until they entered an enclosed walkway bridge from the terminal to the parking area. The committee was composed of six to nine law enforcement officers, the number remains uncertain, all wearing plain clothes. There is a question also about which officers drew guns. It is undisputed that Officer Diane Kotowicz of the Milwaukee Police Department, one of the committee, did at least briefly draw her weapon, but where she pointed it is in considerable doubt. She testified she was fifteen to twenty feet from the defendant at the time she drew. Leon testified, however, that he felt the cold pistol barrel pressed against the back of his neck. DEA Agent Raymond D. Melick testified that Officer Kotowicz's gun was pointed at Leon, but not placed against his neck. FBI Special Agent Hadaway testifed that he was not sure why Officer

Kotowicz drew her pistol, and that she was only two to three feet from Leon when she did. As to where it was pointed Agent Hadaway understandably had a vivid memory as, he explained, her gun was pointed at him. He described her gun as "a little bit larger than average," larger than the .357 Magnum he normally carried. There apparently was no reason for anyone to have been concerned, as Officer Kotowicz testified that she drew her .38 caliber pistol for only about thirty seconds to a minute, and that she had it pointed at the ground the whole time, never at Leon or anyone else. She added, however, that she saw two other committee members, both FBI agents, draw their guns, which somehow escaped the notice of the other testifying officers. In any event, no one got shot.

Novak was promptly arrested on the walkway and handcuffed. Leon was not told he was under arrest, but was requested to accompany the group to a room in the airport which was part of the sheriff's department. Leon says he was escorted by two officers who had him under his arms but no one else testified to any physical contact. Officer Kotowicz testified that she politely asked defendant Leon if she might carry his duffle bag, the luggage later found to contain cocaine, and he consented. She also testified that it was a short walk of about two minutes and that there was no other conversation with Leon on the way. In further explanation, however, of the location of the sheriff's department office, Kotowicz testified that, from the point of the stop, the office was about a block and a half or two blocks away and down a flight of stairs. She believed that the stairs to the sheriff's office did not constitute a public area. Leon, however, testified it took from seven to ten minutes to make that walk. Novak was taken to a separate room. Another phase of this case took place upon Leon's arrival at one of the sheriff's rooms.

That room is also described in the evidence with some uncertainty. Officer Kotowicz described it as "small," possibly 15 feet by 8 feet, but more square than rectangular. DEA Agent Melick estimated

that the room was "approximately 12 by 12, maybe 14 by 14." All agreed, however, that the room had one door, no windows, either no furniture, or possibly a table, or possibly a bench, but no one could remember for sure. Anyway everyone stood. Leon was "primarily" in the company of Officer Kotowicz and the DEA agent, but other officers came and went from the room.

Officer Kotowicz testified that she had received no instructions as to what was to be done, so she engaged Leon in conversation. Her first question to Leon was to inquire if the duffle bag she had carried into the room belonged to him. Leon's answer was "yes." She then asked if she could look in his bag and the defendant responded "yes." Leon also had a second piece of luggage, a shopping bag. Officer Kotowicz could not remember whether she had also carried that, but it is not important to this case. Neither she nor anyone else had, at least prior to the questioning, advised Leon of his *Miranda* rights, or that he could refuse to consent to the search of his bag, or that he could leave (if that was so). No warrants had been issued. Officer Kotowicz testified that she was not familiar with any printed form to be signed by a suspect to permit a warrantless search. Officer Kotowicz promptly knelt on the floor and proceeded to open the bag and look inside at its contents. She testified that she saw one or two clothing items on top and a "square type package." The clothes, she said, were not neatly packed, just "tossed" in. The package was covered, she said, with only one piece of clothing. Further, she explained that after she reached inside Leon's bag and was pulling out the package, part of it being visible, Leon volunteered that, "somebody could have put something in it while we were in Detroit," an intermediate stop for this flight between Miami and Chicago. She proceeded to remove the package, and all other articles from the suitcase. Leon's demeanor she described as calm. She further testified that she probably would have allowed Leon to leave prior to finding the cocaine if he had desired to do so. She could not say whether

Leon had been given *Miranda* warnings by someone else or not, but he was not given any warnings by her.

DEA Agent Melick testified about his version of those events. He testified that when Officer Kotowicz drew her gun she pointed it at Leon. He was the only federal agent who went with Leon into the sheriff's room. His testimony was that *after* Officer Kotowicz began her search of the defendant's bag, but *before* Officer Kotowicz found the cocaine, he advised Leon that Leon did not have to permit the search—a remarkable accomplishment in such a limited period of time. At that moment, he said, he was about ten feet from Leon. He described Leon as "nervous and concerned," not calm as testified to by Officer Kotowicz. He said the bag was stuffed with clothing, layers and layers, not just the few casually packed items mentioned by Officer Kotowicz. It was Agent Melick's opinion, however, that there was no reason for an immediate search of the bag as it could have been retained while a search warrant was obtained. He also testified that he gave Leon his *Miranda* warnings even though he did not place Leon under arrest. He did not read the warnings from a card, but gave them from memory. He also was not aware if anyone had considered bringing a narcotics dog to check the luggage, but he had later found out that the dogs were not immediately available. He agreed, however, that the luggage could have been held until a narcotics dog was available. Just exactly when the search advice or the *Miranda* warning were given, or whether they were complete, was not clear from the testimony. In any event it appears that Officer Kotowicz, who was doing the questioning and the searching, was not aware of those important happenings.

FBI Agent Hadaway, who was the case agent, could not clarify exactly when the DEA agent supposedly advised Leon that he did not have to consent to the search—whether it was before, during or after the bag was opened. He did have knowledge, he said, that no narcotics dog was available.

The trial judge, after examining the transcript of the suppression hearing held before the magistrate and after taking additional testimony, rendered an oral opinion. He first took notice of a "dozen inconsistencies" in the testimony of Officer Kotowicz and DEA Agent Melick, and noted that FBI Agent Hadaway in his brief testimony had contradicted both Kotowicz and Melick.[3] The trial judge also took note of the government's theory that there had been no initial arrest, and that defendant Leon's consent to search was freely given. The trial judge concentrated on the voluntariness of Leon's search consent.

Leon, 27 years of age, was a native of Peru, but had been in this country about four years. He was not viewed as having any serious problem with the English language. However, a translator was present during the trial. Many questions had to be repeated, and Leon's English was described by some as, at best, "halting." The trial judge considered Leon to be of average intelligence and able to respond to questions. The trial judge also found sufficient evidence, although controverted, that defendant Leon had been advised of his constitutional rights. The length of the detention, estimated to be about 17 minutes, was also considered. The defendant had responded to one request to search, not numerous requests. No one had told the defendant he was free to leave. The trial judge came to the conclusion that Leon was in police custody when the search consent was given.

In determining the voluntariness of the search the trial judge noted a number of factors, relying upon *United States v. Talkington*, 843 F.2d 1041 (7th Cir.1988), as a guide. The judge noted that there was no forcible entry, for instance, no handcuffs, no long detention, and no promises were made. The judge also considered Leon's age, intelligence, and education, and the fact that there was no physical coercion or repeated requests for consent. He found that the initial display of weapons, however, was not a factor. The trial judge

then came to the conclusion that the search consent was freely given, "a product of essentially a free and unconstrained choice where the defendant has presented no evidence that the individuals involved made any threats or promises that would affect his judgment." It was then held that the warrantless arrest did not invalidate the search. The court ruled that the search and any statements made by Leon at the time would not be suppressed.

In spite of his rulings favorable to the prosecution, the trial judge offered this observation:

> The Court does feel that this case might be a lot less confusing and a lot less work for everyone, including this Court if the authorities, and the one in charge had done the job that they should have done in the first instance. Its [sic] difficult for me to understand how you could have so much confusion and so much contradiction over what appears to have been a very simple apprehension. Certainly the defendants didn't do anything to compound the problem, like you so often find in matters of this kind.

As to Novak, he was clearly placed under arrest at the time of the first encounter, handcuffed, and taken separately along the same route to the sheriff's department office, but to a different room. He was offered and did sign a consent to search form. At trial Leon testified in his own behalf, but Novak did not.

## ANALYSIS

### A. *Defendant Leon*

■ It is apparent that the constables blundered, but we need to determine the impact.

The district court found that there was at least a "custodial atmosphere" when Leon gave his search consent, and later referred to the encounter "as an arrest." The government complains that the district court made no determination as to whether

---

**3.** In this opinion we have not documented those apparent inconsistencies, but some are apparent

from this brief factual account.

it was merely a *Terry* -type [4] investigation stop, or whether it was a full-fledged arrest. Both types, of course, involve differing degrees of "custodial atmosphere." The government does not contest that there was in fact a "custodial setting," but objects to the district court's failure to determine its degree.

The government fairly and candidly notes, as we expect it to, that there are pertinent factors to support the position of both parties, but on balance it argues that the seizure did not amount to a full-fledged arrest until the cocaine was found in Leon's bag. We think the arrest happened earlier, and at that time was based only on suspicion, not probable cause. We find this to be so notwithstanding the allegation that Leon "consented" to the officers' escort and to the search of his duffle bag, and despite Leon's obviously quickly constructed cover story. The facts in the record are adequate to support our determination. They confirm the district judge's later characterization of the stop as an "arrest," by which we assume he meant more than a *Terry* stop. His factual determination in that regard is entitled to deference unless clearly erroneous, and it was not. *United States v. Espinosa–Alvarez*, 839 F.2d 1201, 1207 (7th Cir.1987).

In making that determination there is no bright line assuring a quick and sure result. It requires an examination of a number of factors as the government has suggested. In our view the stop of Leon may have initially qualified as a mere *Terry* stop, but it quickly accelerated into more than that. As a refresher we shall reexamine a few pertinent authorities in the context of the facts of this case.

In *United States v. Borys*, 766 F.2d 304 (7th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986), the law pertaining both to arrest as well as search was fully reviewed in the context of airport encounters with suspected drug couriers. *Borys* is instructive on the distinction between a consensual questioning, outside Fourth Amendment protection, and a *Terry* investigation detention which does constitute a seizure within the meaning of the Fourth Amendment, but which does not require probable cause as would a full blown arrest. The special limitations on a *Terry* stop are the basis for the distinction. In *Borys* the justification for the *Terry* stop was adequate and its limits were not exceeded. The suspect was specifically told he was not under arrest and that he had a right to refuse the search of his luggage. He was further advised, when he refused the search, that the luggage would be retained in order to seek a search warrant or subjected to a "sniff test." A consensual questioning had ripened into a legitimate *Terry* investigation stop. As the suspect was permitted to leave, the *Terry* stop was then determined to be within limits. Borys was not actually arrested until later, after the "sniff test" was positive.

The present case does not, however, fall clearly within the *Terry* limits delineated in *Borys*. *Borys* involved a short detention, as did the present case, but the suspect in *Borys* was stopped by only two agents, not by the six to nine involved in Leon's arrest. Further, no gun was drawn in *Borys*, and the suspect was not led some distance and down a flight of stairs to a sheriff's office; all contact in *Borys* was in the public area of the terminal.

We therefore agree with the government that the seizure which occurred in the present case requires a further determination of whether it was only a *Terry* stop, or a full-fledged arrest. A *Terry* investigation stop requires at least reasonable suspicion, which in turn requires the ability "to point to specific and articulable facts which, when taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21, 88 S.Ct. at 1879.

The tape of the Novak conversation with the informant Zaffino clearly established that Novak intended to transport cocaine from Miami to Milwaukee. Novak referred generally to an accomplice and the possible use of the accomplice's car. On the tape

---

**4.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Novak also made references to a "Hugo." A check of the airlines by Agent Hadaway revealed that Hugo Leon would be occupying the seat next to Novak on the return trip. Novak, known to the police, walked through the Milwaukee terminal with Leon, who was not then known to the police.

It is doubtful that the officers had probable cause to arrest Leon based on this information; but that is not claimed, only that they had grounds for a *Terry* stop. The government denies that any arrest took place until after the cocaine was discovered in Leon's bag. As a formal matter that is correct, but a consideration of all the circumstances strongly suggests that the stop developed into an arrest, even before the cocaine was discovered.

Both Leon and Novak were suddenly surrounded in the airport's enclosed walkway by, using the government's figures, six to nine law enforcement officers, at least one of whom drew a gun. A federal officer testified that that gun was pointed at Leon. FBI Special Agent Hadaway testified that he would have stopped Leon had he tried to run away during the trip to the sheriff's office. FBI Agent Hadaway, however, later testified that he would "probably" have permitted Leon to leave up to the time the cocaine was discovered. Officer Kotowicz was not sure what she would have done. Novak was handcuffed. The whole group started from the ramp on a walk to the sheriff's office downstairs in the terminal. Leon was not handcuffed, but he was separated from Novak and had officers walking on each side of him, in front of him, and behind him. Two agents took Leon's identification and wallet. Officer Kotowicz asked if she could carry his duffle bag for him, and Leon consented.

It does not appear that anyone told Leon why he was extended an invitation to go to the sheriff's office. No one told him he was not under arrest and was free to leave if he chose. Three officers entered the sheriff's room with Leon. That sheriff's room deserves special mention. It was small, windowless, and apparently unfurnished. No one sat down. What was going on or why, even at this time, was not

explained to Leon. No time was lost by Officer Kotowicz in getting on with the purpose of being in the sheriff's office. She asked if she could search Leon's duffle bag and Leon responded "yes," and she searched it immediately.

Leon had had some arrest experience as he had been briefly arrested previously on a domestic matter. The trial judge noted that Leon had some problems with the English language. An interpreter was present at trial but none was used during the initial detention. There is no evidence about Leon's education. It was found that the whole encounter took about 17 minutes, not an excessive amount of time. *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). All of this, the government says, "conclusively demonstrates that Leon must have known or reasonably should have known that, unlike Novak, he was not under arrest." Nevertheless Leon might be excused for at least wondering why the law enforcement officers, one of whom had pointed a gun at him, had taken his identification, carried his duffle bag, and then closely escorted him out of the public airport area to the sheriff's office.

As to the gun, the government minimizes its influence, arguing that Officer Kotowicz's brandishing of her gun was soon dissipated as she holstered it quickly. Since both defendants were unarmed and there was no evidence of threatening gestures, or any attempt to flee, the use of the gun was unnecessary to convince the defendants that there was considerable police interest in them. The gun was pointed at an FBI agent and understandably caused him concern, except he knew he was not being arrested. It appears that it may also have been pointed at Leon and that could reasonably be expected to suggest to him that it was more than just a friendly welcome.

The government refers us to *United States v. Serna–Barreto*, 842 F.2d 965, 967 (7th Cir.1988). *Serna–Barreto* explains that there is no bright-line distinction between a stop and an arrest as it is a question of degree to be resolved by the exami-

nation of various factors. *Serna–Barreto* held that a *Terry* stop did not become an arrest merely because an officer pointed a gun at the suspect. The encounter was at night as a lone officer approached a car which contained several people. It was made abundantly clear in that opinion, however, that "it would be a sad day for the people of the United States if police had carte blanche to point a gun at each and every person of whom they had an articulable suspicion of engaging in criminal activity." 842 F.2d at 967. This court went on to comment that "we were troubled by allowing police to stop people at the point of a gun when probable cause to arrest is lacking." 842 F.2d at 968. Thus even in *Serna–Barreto*, where there was found some reason for the use of the gun, its use was considered "near the outer edge."

In the present case, by contrast, the stop was by a sizable group of law officers in a lighted public place. The two defendants were not believed to be armed or dangerous. Not being in a car their actions were visible. They offered no resistance and made no suspicious moves. There was no justification for pointing a gun at Leon whom they had no intent to arrest at that time. In our judgment the encounter quickly constituted a full-fledged but warrantless arrest without probable cause. It would be surprising if under those circumstances Leon had felt free to leave. The considerable degree of restraint is obvious. As is set forth in *Borys*, 766 F.2d at 309, the "relevant factor in determining whether a reasonable person would feel free to leave includes the conduct of the police, the person of the individual citizen, and the physical surroundings of the encounter."

To qualify as a mere *Terry* stop, a detention must be limited in scope and executed through the least restrictive means. When first stopped in the main terminal, Leon was given no opportunity to answer any preliminary questions before being escorted without explanation to the sheriff's office. The de facto arrest was made and the questioning and searching began without sufficient showing that *Miranda* warnings were given. Even assuming the *Miranda* warnings were actually given and were

complete it cannot be determined with confidence that they were timely. The searching officer heard none of that. Handcuffs are not the only indicia of an arrest. The difference between a *Terry* stop and an arrest is merely one of degree which makes the determination difficult in some circumstances. *Serna–Barreto*, 842 F.2d at 967. The government fairly considers this present case to be in the gray zone and points to factors weighing both ways. The realities of the situation, in our view, however, move it out of gray into red. We credit the officers with no rough or abusive tactics, or false promises, and with good faith. They just did not handle the stop properly. It became an arrest without their thinking about the totality of what was happening.

The government also calls our attention to *United States v. Espinosa–Alvarez*, 839 F.2d 1201 (7th Cir.1987), which sets forth the standard of review, but which is also helpful in other ways. *Espinosa–Alvarez* also involved an airport stop of a drug courier suspect. However, contrary to the present case, the suspect was informed by the agents that he was not under arrest. The agents asked if the suspect would consent to a search, but that the search would be voluntary and that he could refuse, advice Leon did not receive. Espinosa–Alvarez did refuse. The agents let him leave, but retained his bag. It was quickly subjected to a "sniff test" by a narcotics detection dog, and the suspect was arrested before leaving the airport. This court held that that police-citizen contact did not amount to a Fourth Amendment seizure. The objective test to be applied is found in *United States v. Dyer*, 784 F.2d 812, 815 (7th Cir.1986), which held that "if, in the totality of the circumstances, a reasonable person would not believe that his freedom of movement is restrained, or believes that he remains at liberty to disregard a police officer's request for information, a seizure has not occurred." This court particularly noted in holding that there had been no Fourth Amendment seizure, that the agents in *Dyer* did not display weapons, and that the suspect was not asked to move

to a more private area for questioning, factors which do, however, predominate in the present case. There is no doubt that the detention of Leon was a Fourth Amendment seizure going beyond *Terry* to become an arrest.

 A case similar to the present one is *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Two detectives observed Royer preparing to depart from Miami International Airport and considered him to fit the "drug courier profile." The detectives approached him, identified themselves, and asked if he would speak to them. Royer answered, "Yes." Upon request he produced his ticket and driver's license which revealed a different name than was found on his luggage. Royer offered an explanation. Royer was then informed that the detectives had reason to believe he was transporting drugs. Retaining his ticket and identification and retrieving his luggage from the airline, they requested that he accompany them about 40 feet to a small room, which he did. The officers asked if they could search his bags and he produced a key to one. It was then opened and narcotics were found. Royer then consented, since he did not have the combination, to prying open the other suitcase, and more drugs were found. Royer was then placed under arrest. It had all taken about 15 minutes. The validity of that search depended on the suspect's consent. In such circumstances "the state has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing mere submission to a claim of lawful authority." 460 U.S. at 497, 103 S.Ct. at 1323. In the *Royer* circumstances the Court found that when "Royer produced the key to his suitcase there was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." 460 U.S. at 502, 103 S.Ct. at 1326. Royer was never informed he was free to leave the interrogation room. The court concluded that any "consensual aspects of the encounter had evaporated." 491 U.S. at 509, 103 S.Ct. at 1330. As a practical matter the Court considered that Royer was under arrest. No trained dogs were used. The conclusion was that the stop became an illegal detention so that the consent to search the luggage was tainted by that illegality and was therefore ineffective to justify the search. We cannot but come to the same conclusion in the present case.

The trial judge mentioned *Talkington*, which contains a good discussion of the warrantless entry and search of a home. Using the guidance that *Talkington* provides, we come to a different conclusion than did the district court in the present case. To the extent the district court found the consent to search was voluntary we must view that determination as clearly erroneous considering the totality of the circumstances. *Talkington*, 843 F.2d at 1047.

The war against drugs cannot be fought with unconstitutional procedures. The stop in this case, even without a warrant or a narcotics dog, could have been easily and effectively handled by constitutional means without the brandishing of a gun, or guns, by reaching a clearer understanding with Leon about the nature of the stop and what his rights were, and then by observing those rights. It is not the function of this court, even when guilt may be obvious, to ignore clearly unconstitutional actions by police in order to assist them. That is so even if the unconstitutional police effort was not in bad faith, only misguided. If the police go about their work constitutionally, this court will fully support their critical efforts. There are, however, in this case too many police lapses and inconsistencies. The government bore the burden of proof, and it could not explain away the unconstitutional actions. The lame self-serving excuse, explaining the presence of cocaine in his duffle bag, offered by Leon in his emergency circumstances necessarily must be excluded along with the search.

### B. *Defendant Novak*

Novak was charged jointly with Leon in the three counts of the indictment, tried jointly, and found guilty on all counts as was Leon. Novak raises only one issue, the denial of his motion for severance, Fed.

R.Crim.P. 14. The joint trial was error, he claims, because the defenses of the two defendants were mutually antagonistic.

We have made it clear that we will not overturn the denial of a defendant's motion for severance except upon a finding that the trial judge abused his discretion. *Madyun v. Young,* 852 F.2d 1029 (7th Cir.1988). To justify a severance the defendant carries the burden of establishing actual prejudice to the extent that a fair trial could not be had jointly with the other defendant. *United States v. Peters,* 791 F.2d 1270, 1301 (7th Cir.), *cert. denied sub nom. Odoner v. United States,* 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986). That a separate trial would offer Novak a better chance of acquittal does not alone justify severance. *United States v. Papia,* 560 F.2d 827, 836 (7th Cir.1977). Nor does "some hostility and finger pointing during a joint trial" necessarily lead to the conclusion that severance was necessary. *United States v. Bruun,* 809 F.2d 397, 407 (7th Cir.1987). These severance principles again have been recently restated in *United States v. Williams,* 858 F.2d 1218 (7th Cir.1988), *cert. denied sub nom. Froschauer v. United States,* —— U.S. ——, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989).

Leon, on the other hand, did not ask for a severance even though he ran the risk of Novak defending himself on the basis that it was Leon who was caught with the cocaine, not Novak. Leon's defense was an effort to blame the cocaine in his bag on a third party during a stop in Detroit, the excuse he offered when the search of his bag was underway. His defense was non-participation. He did testify that Novak had told him that he was a cocaine peddler. That, however, was of little consequence in view of the taped conversation between the informant Zaffino and Novak about the latter's upcoming cocaine trip to Miami, the one involved in this case. Novak had little discernible defense. A joint trial was clearly appropriate.

## CONCLUSION

Regrettably, we must reverse the conviction of Leon, and remand for a new trial without the use of the evidence unconstitutionally acquired, if a prosecutable case is determined to remain; otherwise the district judge will have no option but to dismiss the case against Leon. The conviction of Novak is affirmed.