36 F.3d 1099
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Frank DIAZ and Miguel Bolivar, Defendants-Appellants.
 Nos. 93-2537, 93-2578.
 United States Court of Appeals, Seventh Circuit.
 Argued June 9, 1994.
Decided Oct. 4, 1994.
 
 Before CUMMINGS, ESCHBACH and RIPPLE, Circuit Judges.
 
 ORDER
 
 1
 In September 1991 defendants Frank Diaz and Miguel Bolivar and four others[1] were named in a four-count superseding indictment. Count 1 charged the defendants with a conspiracy to possess with intent to distribute cocaine from April 1990 through September 13, 1990, in violation of 21 U.S.C. Sec. 846. Count 2 charged them with distributing 56.68 grams of cocaine on June 5, 1990, in violation of 21 U.S.C. Sec. 841(a)(1). Count 3 charged them with distributing 28.01 grams of cocaine on June 8, 1990, in violation of 21 U.S.C. Sec. 841(a)(1). Count 4 charged them with intent to distribute approximately nine kilograms of cocaine on July 21, 1990, in violation of 21 U.S.C. Sec. 841(a)(1).
 
 
 2
 Diaz and Bolivar were tried together. On November 5, 1992, the jury found Diaz guilty of Counts 2 and 3. The jury, however, was unable to reach a verdict on Counts 1 or 4 as to Diaz or on any count as to Bolivar. On February 16, 1993, after a second jury trial, Diaz was convicted of Counts 1 and 4 and Bolivar was convicted of Count 1.
 
 
 3
 On May 26, 1993, Diaz was sentenced to 108 months' imprisonment and four years' supervised release on each of the four counts, the sentences to run concurrently. On June 10, 1993, Bolivar was sentenced to 150 months' imprisonment on Count 1, but the sentence was amended on July 2, 1993, by adding a five-year term of supervised release to follow his imprisonment.
 
 Facts
 
 4
 In 1989 the Drug Enforcement Administration (DEA) started investigating Angel Flores' drug organization, which operated mainly from the El Parral Tavern at 8701 Commercial Avenue in Chicago. The Flores organization consisted of the six defendants named in the superseding indictment plus Arturo Silva and others unknown to the grand jury.
 
 
 5
 In March 1990 a confidential informant (CI) advised DEA agents that defendant Bolivar had expressed interest in purchasing cocaine in kilogram quantities. Subsequently DEA agents arranged for the CI to meet with Bolivar on several occasions to set up a "reverse buy" drug transaction, with DEA agents posing as cocaine suppliers. From March 1 through March 14, 1990, the CI conferred with Bolivar to arrange for the sale of cocaine. Bolivar became suspicious of the CI and therefore terminated discussions. The district court subsequently authorized DEA agents to intercept telephone conversations to and from Flores' El Parral Tavern. The authorization was for four months.
 
 Diaz Evidence
 
 6
 Based on conversations intercepted on the morning of May 25, 1990, and on surveillance of the El Parral Tavern, DEA agents discovered that Diaz was a street-level distributor of cocaine working for the Flores organization. The agents overheard Diaz ask co-conspirators Arturo Silva and Jose Temores about an anticipated delivery of cocaine. The next day Diaz again asked Temores about the delivery of the cocaine. A few days later Diaz placed another call to Temores. In this conversation Diaz referred to Temores as "boss" and explained to Temores that he had not showed up at a planned drug deal because he did not have all the money needed.
 
 
 7
 The DEA agents thereafter used a second confidential informant (CI2) to arrange a purchase of cocaine from Diaz. On June 4 Diaz agreed to sell CI2 three ounces of cocaine for $1,100 per ounce. This agreement came one day after a telephone call between Diaz and Temores wherein Temores told Diaz that the cocaine would be ready for delivery the following Tuesday or Wednesday. A code name was used to talk about the cocaine. On June 5, Diaz delivered two ounces of cocaine to CI2. Immediately before the delivery Diaz met with co-conspirator Flores.
 
 
 8
 On June 6, 1990, CI2 contacted Diaz to purchase another ounce of cocaine, but Diaz advised him that he could not get the cocaine that day. Later that evening in an intercepted telephone call Temores and Diaz discussed the delivery of cocaine. Code words were again used in this conversation.
 
 
 9
 On June 7 CI2 attempted to contact Diaz about purchasing an additional ounce of cocaine. He was advised by co-conspirator Arturo Silva that Diaz was ready to oblige, and on the following day Diaz sold CI2 another ounce of cocaine for $1,100. Diaz had obtained the cocaine from his apartment. He told CI2 that he could sell him another four ounces of cocaine later at a higher price.
 
 
 10
 In a subsequent conversation between CI2 and Diaz, the latter stated that he had more cocaine to sell and he showed CI2 the place in the basement of the La Clinica Tavern where he had hidden three ounces of cocaine.
 
 
 11
 Between July 9 and July 18, 1990, DEA agents intercepted three coded drug conversations between Diaz and Temores and between Diaz and co-conspirator Silva. During these conversations, Diaz, Temores and Silva used code words to refer to cocaine. In the July 9th conversation Diaz was asked by Temores about selling six kilograms of cocaine in Temores' possession. They also discussed how Diaz had been given cocaine on credit and that Diaz needed to collect money before more cocaine was given him on credit. That same day Diaz telephoned Temores to report that Diaz had not collected the money from selling cocaine and that he needed two additional kilograms.
 
 Bolivar evidence
 
 12
 On July 6, 1990, DEA agents intercepted a coded telephone conversation between co-conspirators Flores and Temores. This caused the agents to believe that Flores and Temores were going to meet with another person, a "professional who cuts grass [i.e., cocaine]," on July 7 between 9 and 10 A.M. to conduct a drug transaction.
 
 
 13
 On the morning of July 7, defendant Bolivar met Flores and Temores, and Flores drove all three to his south side restaurant. Afterwards the three men were driven by Flores to the El Parral Tavern. Bolivar then walked over to a green Chevrolet and opened its trunk to remove a maroon briefcase. After he returned to Flores' car, the three men drove to a nearby garage and Temores left the group. Flores and Bolivar then drove to a nearby park where Temores rejoined them, now driving a white and maroon Toronado automobile. Bolivar joined Temores in the Toronado. Flores continued in his car. The three men then went to the El Parral Tavern.
 
 
 14
 After meeting with Temores and Flores inside the El Parral Tavern, Bolivar drove the Toronado to the north side of Chicago via a circuitous route. The undercover agents following the Toronado realized that Bolivar had recognized their surveillance and decided to stop him. They did not place him under arrest because they did not wish to compromise their undercover investigation. After stopping Bolivar the agents asked him about his possession of the Toronado and the maroon briefcase. Bolivar stated that the briefcase was his and that inside it was money from the sale of a restaurant. Bolivar also stated that he borrowed the Toronado from a Jose Luis. Bolivar then agreed to accompany the agents to their office for further questioning and the inspection of the Toronado and the briefcase.
 
 
 15
 The inspection of the Toronado revealed that it was an illegal drug "load car" containing secret compartments. It was registered to co-conspirator Silva with the listed address being the El Parral Tavern. The briefcase contained $26,000 in cash, a $1,000 cashier's check payable to Bolivar, and miscellaneous documents that he claimed related to the sale/purchase of a restaurant. The agents also discovered a key to a room in an Oak Lawn, Illinois, Holiday Inn. The key was discovered when Bolivar attempted to discard it en route to the DEA office. Bolivar stated that he had rented the room for himself and two women. During the questioning of Bolivar, he received a call on his beeper from Flores' residence.
 
 
 16
 After their interview with Bolivar at the DEA office, the agents seized the Toronado and the $26,000 in cash. They then drove Bolivar to the Oak Lawn Holiday Inn. The search of the room revealed two men's toilet article kits, men's clothing and a checkbook in the name of Pedro Chavez of El Paso, Texas. There was no evidence that women had been in the hotel room as Bolivar claimed. The agents then left Bolivar at the Holiday Inn.
 
 
 17
 Later that evening the DEA agents intercepted a telephone call between Mrs. Temores and her husband, who was at the El Parral Tavern. This conversation revealed that Bolivar had called the Temores residence to speak to Temores and that Bolivar had asked Mrs. Temores to tell her husband to call him. Later that evening in an incoming call from Bolivar to the private line at the El Parral Tavern, Bolivar asked Temores about the ownership of the Toronado. Bolivar then told Temores to call him from a public phone. Thereafter DEA agents intercepted several calls between Flores and Temores discussing Bolivar's stop and questioning. In the next two days, Bolivar attempted to contact Temores as revealed in several intercepted calls.
 
 
 18
 On July 9, Bolivar called Temores at the public phone inside the El Parral Tavern. Bolivar discussed his stop by DEA agents on July 7. He advised Temores that the Toronado and money had been seized. Bolivar said the Toronado was now parked in the federal garage but that there was nothing in the car. He said that Flores was upset because Bolivar had not contacted Temores about the stop. Bolivar and Temores then talked in code and Bolivar asked Temores whether he was at a public phone. Bolivar told Temores that he had been followed by the police after getting into the Toronado and was unsuccessful in trying to lose them.
 
 
 19
 After this conversation between Bolivar and Temores, DEA agents intercepted another call to Flores placed by Temores from the El Parral Tavern. Temores advised Flores what Bolivar had told him about the seized Toronado. Temores then advised Flores that he told Bolivar that Bolivar could no longer work for the drug organization, at least for a while.
 
 
 20
 During his second trial, Bolivar's motion to suppress evidence was denied. The government dismissed all but the conspiracy count (Count 1) against Bolivar. After a four-day trial, Bolivar and Diaz were convicted under Count 1. Diaz was also convicted under Count 4 for possession with intent to distribute nine kilograms of cocaine seized on July 21, 1990. Diaz had been found guilty of Counts 2 and 3 at the first trial.
 
 Analysis
 
 21
 Denial of Bolivar's motion to suppress evidence
 
 
 22
 With respect to his pretrial motion to suppress evidence, Bolivar argues that it was wrongly denied. He claims that the July 7, 1990, stop of the Toronado he was driving was pretextual and improper. We disagree.
 
 
 23
 Before Bolivar was stopped alone in the Toronado, the agents had intercepted a conversation between Flores and Temores on July 6 in which they discussed a meeting for July 7 between 9 and 10 A.M. with a professional who cuts cocaine. Bolivar then met with Flores and Temores at the scheduled time. The three then engaged in actions witnessed by DEA agents which were consistent with a drug transaction. Judge Will therefore determined that although the officers did not reveal their actual reasons for stopping the Toronado (and instead indicated that he was being stopped for a traffic violation), the stop was not pretextual since the officers had probable cause to take such action. We agree. The intercepted phone conversation and the actions of Temores, Flores and Bolivar gave the agents reasonable grounds to suspect that Bolivar was involved in a drug transaction. The stop of the Toronado was proper.
 
 
 24
 Bolivar also claims that the traffic stop was actually an illegal arrest. The district judge, however, concluded that Bolivar was not placed under arrest when he was stopped in the Toronado. We agree. The evidence shows that Bolivar agreed to accompany the DEA agents in their car to their office and subsequently to the Holiday Inn hotel. The evidence also shows that Bolivar signed a consent form for the search of the Toronado and had voluntarily unlocked his briefcase for the agents' inspection at their office. Therefore the district judge was warranted in holding that there was no illegal arrest or illegal search of the Toronado. Cf. United States v. Kozinski, 16 F.3d 795, 810 (7th Cir.1994).[2]
 
 
 25
 The district judge also correctly concluded that even though the agents did not arrest Bolivar, they would have had probable cause to do so since they had reason to believe Bolivar and the car had been involved in a drug transaction. The denial of Bolivar's motion to suppress was clearly warranted.
 
 Evidence supporting conspiracy conviction
 
 26
 Both defendants claim that the evidence was insufficient to support their Count 1 conspiracy convictions.
 
 
 27
 There is ample evidence of Diaz's involvement in the drug conspiracy. The evidence proved that he delivered cocaine on two occasions. He had numerous conversations with co-conspirators Temores and Silva over a three-month period discussing drug deals in coded language. He sold two ounces of cocaine under the supervision of Flores to a CI on June 5, 1990. This took place in a Walgreen drugstore that was also the location for Flores and Temores during a subsequent drug transaction. In sum, the evidence showed that Diaz had frequent conversations with conspirators, discussed drug activities, and engaged in drug deals at the El Parral Tavern. The jury could therefore find that he was a member of the conspiracy.
 
 
 28
 The evidence is also sufficient to establish Bolivar's membership in the conspiracy. A CI advised DEA agents that he knew someone associated with the El Parral Tavern who was interested in purchasing kilogram quantities of cocaine. The CI thereafter arranged to sell Bolivar multiple cocaine kilograms. He had numerous conversations with the CI and negotiated a price and inspected the cocaine being offered for sale. The evidence also established that Bolivar appeared for a drug transaction with Flores and Temores in July 1990. Prior to the transaction, Temores indicated that Bolivar cut Temores' cocaine for street-level distribution. Moreover, Bolivar's conduct during and after that encounter indicate he was a knowing member of the drug conspiracy. For example, Bolivar was given the use of a drug-load car and made phone calls after being stopped to Flores and Temores to warn them that the DEA had seized the car and the $26,000. In addition, Flores and Temores discussed Bolivar's detention by police and remarked that he would not be working for the Flores organization for a while since he might have agreed to cooperate with the authorities.
 
 
 29
 When considered in the light most favorable to the government, the evidence was clearly sufficient for the jury to find that Bolivar and Diaz were participants in a conspiracy to possess cocaine with intent to distribute it.
 
 
 30
 Calculation of the sentencing guideline range for Diaz
 
 
 31
 At the sentencing, Judge Will determined that Diaz's sentence should be based on the foreseeability of the fact that the conspiracy involved distributing at least three to four kilograms of cocaine rather than just the three ounces of cocaine he personally distributed. It is well settled that the amount of narcotics considered in sentencing for conspiracy includes not only the amounts known to the defendant but those that were reasonably foreseeable. United States v. Mojica, 984 F.2d 1426, 1442 (7th Cir.1993). This record amply supports the district judge's finding that Diaz knew or should have known that the conspiracy involved three to four kilograms of cocaine. Not only was Diaz a distributor for the Flores drug organization--a large scale organization--but taped conversations showed that he had discussed multiple-kilogram cocaine deals. In fact, in one conversation Diaz mentioned a six-kilogram transaction and in another he asked for additional kilograms amounts of cocaine. Moreover, he was still a member of the conspiracy when nine kilograms of cocaine were seized from Flores and Temores on July 21, 1990. Out of judicial caution he was sentenced to 108 months' imprisonment on the basis of only three to four kilograms. The district court's determination was not clearly erroneous.
 
 
 32
 Evidence concerning Diaz's prior drug transactions
 
 
 33
 Diaz urges that the evidence of certain drug transactions that occurred during the course of the conspiracy were not admissible in view of Rule 404(b) of the Federal Rules of Evidence. Although Rule 404(b) forbids evidence of other crimes "to prove the character of a person," it is "admissible for other purposes." Thus Rule 404(b) is inapplicable when dealing with direct evidence of a conspiracy ( United States v. Diaz, 994 F.2d 393, 394-395 (7th Cir.1993)) or when the evidence is intricately related to the facts of the case. United States v. Parkin, 917 F.2d 313, 317 (7th Cir.1990). Therefore there was no error.
 
 Conclusion
 
 34
 The convictions and sentences are affirmed.
 
 
 
 [1]
 The remaining named defendants were Angel Flores, Jose Temores, Jose Juarez and Antonio Amaya
 
 
 [2]
 Since Bolivar was not under arrest, United States v. Ingrao, 897 F.2d 860 (7th Cir.1990), and United States v. Novak, 870 F.2d 1345 (7th Cir.1989), are inapplicable. Moreover, as the district court correctly concluded, the officers would have had probable cause to effectuate an arrest if they had chosen to do so