UNITED STATES of America,
Plaintiff–Appellee,

v.

Aida SERNA–BARRETO,
Defendant–Appellant.

No. 87–1441.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 26, 1988.

Decided March 29, 1988.

Michael Wilkie, Steven B. Muslin, Ltd., Chicago, Ill., for defendant-appellant.

Zaldwaynaka L. Scott, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY, POSNER and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

Aida Serna–Barreto was convicted of possession of cocaine with intent to distribute (21 U.S.C. § 841(a)(1)) and sentenced to seven years in prison. The only question raised by her appeal is whether the government exceeded its right under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to stop a suspect briefly for investigative purposes even if probable cause is lacking for an arrest. The cocaine that Serna–Barreto was convicted of possessing was seized in the course of a *"Terry* stop" that, she contends, was really an arrest.

Narcotics agents in Chicago were following Rodrigo Cleves, whom they suspected

of smuggling cocaine into this country from Colombia. One evening, shortly after the agents saw Cleves drive up to and enter a restaurant, a car registered to another suspected cocaine trafficker and driven by a third person, Germain Valencia, arrived at the restaurant. Valencia went in and shortly afterward Serna–Barreto and a male companion arrived on foot and went in too. Chicago Police Lieutenant Maurice Dailey recognized Serna–Barreto because he had arrested her several years previously for possession of cocaine.

An agent entered the restaurant to keep watch on the four suspects, all of whom sat down at the same table and began passing a small plastic box back and forth among them, both under and over the table. Drawing on his general experience as a narcotics investigator, the agent surmised that either negotiations for a narcotics purchase were in progress or a sample of the merchandise was being passed around for inspection. The agent went to a telephone, called the radio dispatcher, and told him to tell the agents outside, "It looks good."

The four suspects left the restaurant about an hour after they had arrived. They stood outside the restaurant for several minutes, then split up. Cleves and Valencia drove away in Cleves' car. Serna–Barreto and her companion went to the car that Valencia had arrived in. She slid into the driver's seat and her companion into the front passenger's seat. As soon as they were seated, Officer Dailey, who was in plainclothes, approached the driver's side of the car, apparently with his gun pointed at the occupants (although the record is sketchy on this point and the details uncertain, the government concedes and we shall assume that the gun was indeed pointed at them), showed his police identification, and told Serna–Barreto to get out. As she did so, she tossed a plastic cassette box (the same box that had been passed around in the restaurant) under the car. Dailey retrieved the box, discovered cocaine in it, and arrested Serna–Barreto. The district judge held that Dailey had not exceeded the lawful scope of a *Terry* stop in ordering Serna–Barreto out of the car and that therefore the cocaine seized as a result of the stop was admissible in evidence against her.

The Fourth Amendment has been interpreted to forbid police to arrest a person without probable cause, which is to say a high degree of suspicion that the person has committed a crime. An arrest is a profound and deeply resented interference with the liberty of the person, and to allow police to arrest people on anything less than a high degree of suspicion would restrict personal liberty more than has been thought justified by the needs of public security. When the restriction is less than that involved in a full-fledged arrest, the degree of suspicion required is less. If all that is involved is a police officer's accosting a person and asking him whether he would be willing to answer a few questions, the degree of suspicion required is zero. *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983) (plurality opinion). The intermediate case is that of the investigatory stop. If the police have enough suspicion to be able to articulate it ("articulable suspicion")—that is, if they have more than a pure hunch—they can stop a person briefly to ask him a few questions or to pat him down if they think he may have a weapon. They cannot take him down to the station house; that would be an arrest.

The reason for creating the intermediate category, the investigatory stop, is not merely the appealing symmetry of a "sliding scale" approach—though that is relevant, since it is common sense that if the Fourth Amendment is intended to strike a balance between the interest of the individual in being left alone by the police and the interest of the community in being free from the menace of crime, the less the interest of the individual is impaired the less the interest of the community need be impaired to justify the restraint. But beyond that, it is hard to see how criminal investigations could proceed if the police could never restrict a suspect's freedom of action, however briefly, without having probable cause to make an arrest. The facts of this case illustrate the problem as

well as any. Knowing what they did about two of the four people sitting around that table at the Mateos Restaurant, about the person in whose name the car driven by Valencia was registered, and about the modus operandi of drug traffickers, the police had a reasonable suspicion that when Serna–Barreto and her companion (bodyguard?) left the restaurant and got into the car that had been driven there by Valencia, she was carrying cocaine just purchased from a smuggler. The objective basis for their belief may not have been strong enough to allow them to arrest her, but if they let her drive away there was a substantial probability (it was night) that they would "lose" her and the drugs. In these circumstances it was natural and sensible to stop her from leaving for long enough to ask her what her business had been in the restaurant and what she was doing in a car that did not belong to her and that she had not arrived in, and to hope that her answers would supply the additional information needed to make an arrest on probable cause. Because the investigatory stop was interrupted when she tried to secrete the cocaine, we don't know how long the stop would have lasted. But a *Terry* stop is not invalidated by the possibility that, if it had not been interrupted almost before it began, it might have gone on for too long to count as a mere stop.

The distinction between a stop and an arrest is one of degree, so it is not surprising that the courts have had difficulty in coming up with a bright-line test. Instead they have tended to follow the laundry-list approach, well illustrated by the list (not exhaustive) of factors (all relevant, none decisive, and no indication of how to weigh or compare them) in *United States v. White*, 648 F.2d 29, 34 (D.C.Cir. 1981): officer's intent, impression conveyed, length of stop, questions asked, search made. Length of time seems the most important consideration in deciding whether a restraint is a mere stop or a full-fledged arrest, because it is a direct measure of the degree to which the citizen's freedom of action has been interfered with. But it cannot be the only factor. Remember that we are trying to balance

the individual's interest in being left alone by the police with the community's interest in effective enforcement of the criminal laws. The individual's interest is measured not only by the duration of the restraint but also by the fear or humiliation which it engenders. It makes a difference whether the police merely insist that the suspect stop and answer a few questions and submit to a pat down or whether they manacle him or conduct a strip search.

This brings us to the most problematic element of this case, which is that Officer Dailey (we are assuming) pointed his gun at Serna–Barreto when he ordered her out of the car. The significance of this is not that it assured compliance with his order. A stop is a stop; if an encounter with the police is not coercive, the Fourth Amendment is not in play in even an attenuated form and the officer is not required to demonstrate that he had even an articulable suspicion. The significance of the pointed gun is that it makes the encounter far more frightening than if the officer's gun remains holstered, or even drawn but pointed down at his side; and certainly where the danger of the encounter to the officer, though potentially serious, is not clear and present, the deliberate pointing of a gun at the suspect is problematic. See *United States v. White, supra,* 648 F.2d at 34 n. 27. It would be a sad day for the people of the United States if police had carte blanche to point a gun at each and every person of whom they had an "articulable suspicion" of engaging in criminal activity.

But this case falls short of that ominous prospect. Among the considerations supporting the district judge's determination that this was a lawful stop are, first, that the encounter occurred at night; second, that the suspects were suspected on more than a hunch or an uncorroborated informer's tip of narcotics offenses; third, that many drug traffickers are armed and they sometimes shoot policemen; fourth, that there were two suspects and (at first) only one officer (others were on the scene, and assisted in the arrest of Serna–Barreto and her companion after she tried to grab the

cassette box back from Dailey); fifth, that because the suspects were seated in a car the officer did not have them in full view (see *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) (per curiam)); and sixth, that—surprising as this may seem—Serna–Barreto testified that she was not scared by the gun. It seems that somehow Officer Dailey was able to deploy his weapon in a fashion that protected him without appearing to menace the person at whom it was pointed. Although subjective belief is not determinative on whether an ostensible stop is actually an arrest, Serna–Barreto's testimony is strong evidence in an otherwise sketchy record that, if Officer Dailey did in fact point his gun at her, he did so in a manner that protected him without unduly threatening her.

The constellation of facts to which we have referred entitled the district judge to conclude that Dailey acted reasonably in a situation of potential danger and did not make an illegal arrest. This conclusion would be unavailing if a *Terry* stop always turns into an arrest as soon as an officer points his gun at the suspect, but while a divided panel opinion in the Ninth Circuit suggests such a rule, *United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974), this cannot be right, especially where as in the present case the officer is doing it to protect himself, a qualification implicit in a later Ninth Circuit decision, *United States v. Ramos–Zaragosa*, 516 F.2d 141, 144 (9th Cir.1975). The Tenth Circuit has held that there is no such per se rule. See *United States v. Merritt*, 695 F.2d 1263, 1272–74 (10th Cir.1982). Although we are troubled by the thought of allowing policemen to stop people at the point of a gun when probable cause to arrest is lacking, we are unwilling to hold that an investigative stop is never lawful when it can be effectuated safely only in that manner. It is not nice to have a gun pointed at you by a policeman but it is worse to have a gun pointed at you by a criminal, so there is a complex tradeoff involved in any proposal to reduce (or increase) the permissible scope of investigatory stops. We need not decide in this case just how great that scope should be, though clearly we are near the outer edge.

*United States v. Ceballos*, 654 F.2d 177 (2d Cir.1981), the decision that after *Strickler* is the most helpful to Serna–Barreto, is distinguishable from the present case. Policemen in three cars blocked Ceballos' car and, approaching him with drawn guns, ordered him out and frisked him. The court could find no justification for this massive show of force. But here it was prudent for Officer Dailey when approaching the two suspects alone to do so with drawn gun. *Ceballos* has been read narrowly. See, e.g., *United States v. Jones*, 759 F.2d 633, 639–41 (8th Cir.1985). *Ceballos* does, however, engender a residual doubt in our minds, because the suspects remained for several minutes standing in front of the restaurant where they could have been approached with less danger to the officers than after the suspects got into a car, and because the record does not make clear why Dailey approached the car by himself when there were other officers on the scene. But we are not equipped to supervise police tactics minutely. The police may not have wanted to give away their presence to Cleves and Valencia, and may have felt that rushing the car en masse would alert the occupants prematurely.

AFFIRMED.