**UNITED STATES of America,**

v.

**Samuel HATCH and James Cooper, Jr.**

**No. FCR 93–20.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

July 14, 1993.

---

David H. Miller, for U.S.

Richard E. Beers, Donald C. Swanson, Jr. (Ret.), Fort Wayne, IN, for defendants.

*ORDER*

WILLIAM C. LEE, District Judge.

This case is before the court on the Motion to Quash Illegal Arrest and Suppress Evidence filed by the defendants, Samuel Hatch and James Cooper, Jr. on May 26, 1993.[1] An evidentiary hearing was held on June 4, 1993, at which time the court took the matter under advisement and directed the parties to file supportive briefs. The defendants filed their "Memorandum of Law in Support of Motion to Quash Illegal Arrest and Suppress Evidence" on June 14, 1993. The government filed its response on June 15, 1993, and the defendants filed a reply on June 21, 1993. For the following reasons, the motion is DENIED.

*Factual Background* [2]

On the morning of April 20, 1993, Special Agent Kenneth E. Ivan of the Federal Bureau of Investigation Fort Wayne office, received a telephone call from an unknown individual. This anonymous tipster informed Agent Ivan that two black males, identified as Sam Hatch and James Cooper, had left the Miami, Florida area on April 19, 1993, at approximately 6:30 p.m. and were en route to Fort Wayne, Indiana with approximately five (5) kilograms of cocaine. The tipster described the vehicle the men would be driving as an older model Ford pick-up truck, white and gray in color, with wide tires, a tinted windshield and Florida license plate number LPS 71K. The tipster indicated that the five kilograms would be stored in the vehicle's gas tank. The tipster also advised that the two individuals would be arriving on U.S. Highway 33 into Fort Wayne, and that the cocaine would be delivered to an unspecified house just off Highway 33.

Agent Ivan forwarded this information to FBI Special Agent John McGauley who contacted Indiana State Trooper Rudy Eidam of the Allen County Drug Task Force. Agent McGauley requested the Task Force's assistance in intercepting the vehicle. Task Force member and Allen County Police Officer Steven Haxby used a computer simulator to calculate the approximate driving time and concluded that the vehicle would arrive in the Fort Wayne area within 22–24 hours of its departure from Miami, Florida. Various members of the Allen County Drug Task Force were notified and gathered south of Fort Wayne, near the intersection of U.S. Highway 33 and Indiana Highway 101 in Pleasant Mills, Indiana.

At about 5:40 p.m. on April 20, 1993, a vehicle similar to the one described by the anonymous tipster was spotted driving north on Highway 33. Members of the Task Force corroborated all the information the tipster had given regarding the vehicle and its occupants. The description of the truck (an older model Ford pick-up truck, white and gray in color, with wide tires, a tinted windshield and a Florida license plate), the license plate number, the occupants being two black males, the route of travel, and the time of arrival were all confirmed as matching the information in the tip. Furthermore, a check on the license plate numbers had identified the owner of the truck as Samuel Hatch. Officer Haxby, who had prior dealings with Samuel Hatch, visually identified Hatch as the driver through the windshield of the passing truck.

After the information in the tip was verified, Trooper Eidam radioed Trooper Tony Knox of the Indiana State Police, ordering Knox to use his marked squad car to pull Hatch's truck over. Knox was waiting at the southern boundary of Allen County on Highway 33. When Hatch and Cooper passed Knox, the Trooper pulled out behind the defendants and activated his flashing red emergency lights, indicating that the defendants should pull off the road. Approximate-

1. Hatch filed his motion to suppress on May 26, 1993, and Cooper filed a similar motion on the following day, stating that he was relying on the arguments put forth in Hatch's motion and memoranda.

2. The factual background is compiled from the evidentiary hearing. Where substantial factual disputes exist, they are so indicated. The facts as recited herein are as the court has found. At that June 4, 1993 hearing, the court heard testimony from FBI Agents John McGauley and Steven Kell, Indiana State Police Troopers Tony Knox and Rudy Eidam, Allen County Police Officer Steven Haxby, and defendant James Cooper. Defendant Samuel Hatch did not testify.

ly one mile north of the southern boundary of Allen County on Highway 33, Hatch and Cooper pulled to the side of the road, where Knox stopped the defendants. Trooper Knox pulled his police squad car in just behind the Hatch's truck, on the shoulder of the road. Three other law enforcement vehicles quickly converged on Hatch's truck. Trooper Eidam pulled his car in front of Hatch's truck, onto the berm of the four lane divided highway. Allen County Officer Haxby stopped his unmarked police car in the right lane of the highway adjacent to Knox's vehicle. Agent McGauley, with his passenger Agent Steven Kell, pulled in behind Trooper Knox's vehicle in McGauley's unmarked FBI vehicle.

Upon stopping, Hatch promptly got out of his truck.[3] Trooper Knox immediately directed Hatch to get back into the truck. However, Hatch continued toward Trooper Knox, and Knox drew his weapon, ordering Hatch to return to the truck and place his hands upon the dashboard.[4] Three other officers surrounding the truck, Officer Haxby, Agent Kell and Trooper Eidam, also quickly drew their weapons, pointing them in Hatch's direction, and directing Hatch to comply with Knox's order. After the officers drew their weapons, Hatch complied with Knox's order by reentering the truck and placing his hands on the dashboard. The officers returned their weapons to their holsters when Hatch reentered his truck.[5]

At the time he pulled Hatch and Cooper over, Trooper Knox did not have his gun drawn; the officers did not have their weapons drawn until Hatch made the threatening gesture towards Trooper Knox. The incident in which the officers' weapons were drawn lasted very briefly.

After Hatch returned to the truck, and in accordance with Trooper Knox's instructions, Cooper then exited the truck through the passenger door. Upon Cooper's exit from the truck, Knox frisked Cooper for weapons. Finding no weapons, Knox directed Cooper to stand at the back of the truck. Trooper Knox next ordered Hatch to exit the truck. Knox then patted Hatch down for weapons, found no weapons, and escorted Hatch back near his squad car. At that time, Knox advised Hatch of his *Miranda*[6] rights. Hatch informed Knox that Hatch had owned the truck for some time.

Meanwhile, Agent McGauley and Agent Kell approached Cooper. McGauley testified that he identified himself by showing Cooper his credentials and his FBI badge. McGauley requested Cooper to accompany him back to his FBI vehicle to discuss the reason for the stop. The officers testified that April 20, 1993, was a windy and brisk day on the open highway and they wanted to question the suspects out of the cold.[7] McGauley further testified that he told Cooper he was absolutely not under arrest and that Cooper agreed to follow McGauley to McGauley's vehicle. Upon McGauley's suggestion, they walked toward McGauley's unmarked vehicle, with McGauley in front, followed by Cooper, and then Kell. Officer Haxby followed shortly thereafter.

Agent McGauley informed Cooper that Cooper was not under arrest and that he was free to leave. McGauley also advised Cooper of his rights when they were seated in McGauley's vehicle. Although Cooper testified that McGauley never informed him that he was free to leave and never informed him of his rights, McGauley, Kell, and Haxby testified that McGauley had so advised Cooper.[8] The court finds the officers more cred-

---

**3.** Officer Haxby testified that when Trooper Knox pulled Hatch and Cooper over, "the driver's door opened up and Mr. Hatch jumped out of the truck."

**4.** On direct examination, and in response to the question when asked why he drew his weapon on Hatch, Trooper Knox replied, "I verbally had told the individual [Hatch] to get back in the vehicle and [yet] he proceeded to walk back towards me."

**5.** Officer Haxby returned his weapon to his vehicle.

**6.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**7.** Cooper agrees that the weather was "chilly" when he and Hatch were stopped.

**8.** Agent McGauley testified that he told Cooper that Cooper was not under arrest and that he was free to leave, and that Cooper was advised of

ible, and that Cooper was told that he was not under arrest, that he was free to leave, and was advised of his rights.

Upon reaching McGauley's vehicle, McGauley entered the driver's side door, Cooper entered the passenger's side door, and Officer Haxby sat in back seat. Agent Kell stood outside the passenger door, where, with the window down, he listened to the conversation. McGauley informed Cooper of the information that the tipster had given them, and then asked Cooper if the information was correct. At first, Cooper denied knowing of any cocaine in the truck. After McGauley repeated his question two or three times, Cooper answered that there were "two kilos" in a suitcase behind the driver's seat.[9] The officers then left the car and went to talk to Hatch.

McGauley approached Hatch, identified himself as an FBI agent, told Hatch that he was not under arrest, and told him that he was free to go.[10] McGauley advised Hatch of his rights and then told him that they had reason to believe the truck contained cocaine. Hatch denied knowing of any cocaine in the truck. McGauley asked Hatch if he would consent to a search of the truck and Hatch orally agreed to a search. McGauley asked Hatch if he would sign a consent to search form and Hatch agreed. Knox prepared a consent to search form which McGauley carefully read to Hatch, as Hatch indicated that he had little education and could not read or write well. After reading each line on the consent form, McGauley paused to ask Hatch if he understood. After each line, Hatch stated that he did so understand. At 6:13 p.m., Hatch signed the consent form.

Agent McGauley, Trooper Eidam and other officers searched the truck and found a brown, soft-sided suitcase behind the driver's seat. Inside the unzipped suitcase were two packages wrapped in duct or packaging tape which the officers believed to contain cocaine. Eidam and Haxby then performed a field test on the contents of the two packages. One package contained $23,000 in U.S. currency, and the other package tested positive for cocaine. Both defendants were then formally placed under arrest and transported to the Allen County Jail.

The officers arranged for Hatch's truck to be towed to the Indiana State Police Post at Fort Wayne, where it was inventoried by Trooper Knox. Having sheltered the truck from the wind, Judd, Knox's canine, performed a narcotics search of the truck. Judd alerted under the back end of the truck near the gas tank.

The truck was secured until a search warrant was issued the next day by United States Magistrate Judge Roger B. Cosbey. While executing the warrant, the officers had the gas tank removed. The tank contained a false compartment in which the officers found four packages similar to those seized the previous day from the suitcase which was found behind the driver's seat. The four packages from the gas tank area also contained a white powdery substance which field tested positive for cocaine. In total, the truck contained 5 packages of cocaine and one package of $23,000 in U.S. currency. On April 21, 1993, both defendants were charged with violations of Title 21, United States Code, Section 841(a)(1), possession with intent to distribute more than 500 grams of cocaine.

his rights when they were seated in McGauley's vehicle. Agent Kell testified that Cooper was advised of his rights during a pause in the walk from Hatch's truck to McGauley's vehicle. Officer Haxby testified that he and McGauley showed Cooper their badges in McGauley's vehicle and that McGauley told Cooper he was not under arrest and that he was free to leave. Cooper testified that McGauley said nothing when he approached Cooper. Cooper further testified that McGauley never advised him of his rights on the highway or in McGauley's car, but he did identify himself as a Special Agent of the FBI.

9. Cooper maintains that he did not make any admissions and did not inform the officers of the location of "two kilos." However, McGauley, Haxby, and Kell all testified that Cooper did inform them that two kilos were behind the seat on Hatch's truck. The court finds the officers more credible in this regard.

10. McGauley testified that he pointed north with his arm outstretched toward Fort Wayne when he told Hatch he was free to go. McGauley also testified that at that time, he would not have released the truck, as he believed probable cause existed, based on the corroborated tip and Cooper's admission.

## DISCUSSION

Samuel Hatch and James Cooper, Jr. maintain that they were subjected to an illegal search and seizure in violation of the Fourth Amendment, and therefore, all seized items should be suppressed from the evidence at their trial, pursuant to *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Hatch and Cooper argue: (1) that the "investigative stop" encounter was not based upon a reasonable suspicion; (2) that the encounter became an unconstitutional arrest when, with the truck surrounded by four law enforcement vehicles, the four officers leveled their service revolvers on Hatch and ordered him to re-enter his truck; and 3) that they did not freely consent to the search of Hatch's truck. The government argues that the law enforcement officers had a reasonably articulable suspicion of criminal activity which would justify an investigatory stop, that the stop performed was merely a short, investigatory detention which was minimally intrusive into the defendants' privacy, and that the defendants voluntarily consented to the search.

The court is thus called upon to decide the following three issues: First, whether the information given by the anonymous tipster gave the police reasonable suspicion or probable cause; second, whether the Hatch and Cooper were subjected to an investigatory stop, or whether they were subjected to such a degree of force that the stop was in fact an arrest; and third whether the defendants freely and voluntarily consented to the search.

### The Legality of the Initial Stop

The first challenge posed by the defendants is that the information in the anonymous tip and the subsequent corroboration of that information did not give the police reasonable suspicion to make an investigatory stop or probable cause to make an arrest.

The court recognizes that not all encounters between the police and citizens implicate the Fourth Amendment's prohibition on unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968); *United States v. Edwards*, 898 F.2d 1273, 1277 (7th Cir.1990). Three categories delineate the extent of Fourth Amendment protections associated with police-citizen encounters. In *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied* 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991), the Seventh Circuit reviewed those categories and characterized them as follows:

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe that a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment 'seizure,' but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

*Johnson*, 910 F.2d at 1508 (citations omitted); *United States v. Williams*, 945 F.2d 192, 195 (7th Cir.1991). With regard to the third category, the consensual encounter, "the degree of suspicion that is required is zero." *United States v. Serna–Barreto*, 842 F.2d 965, 966 (7th Cir.1988); *Williams*, 945 F.2d at 195.

In this case, the police unquestionably restrained the defendants' liberty to some degree by pulling over their truck, thus, the encounter must have been at least an investigatory stop. *Terry* authorizes an investigatory stop when the police have reasonably articulable suspicion of criminal activity. *Id.* 392 U.S. at 21–22, 88 S.Ct. at 1879–80. Reasonable suspicion is determined by the totality of the circumstances. *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990), (*citing United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). As the Supreme Court stated:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be

established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *White,* 496 U.S. 325, 330, 110 S.Ct. at 2416.

Additionally, the Seventh Circuit further explain this concept in *United States v. Ocampo,* 890 F.2d 1363, 1367–1368 (7th Cir. 1989):

> In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that consistent with the fourth amendment, a police officer who observes suspicious activity may, though he lacks the probable cause traditionally necessary to make an arrest, stop an individual briefly to investigate the circumstances provoking the suspicion, provided that the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. A *Terry* investigatory stop is a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity. To determine whether an officer's suspicion of criminal activity was reasonable, a court must evaluate the totality of the circumstances as they appeared to the officer at the time of the stop. *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

The government argues that the combination of the anonymous tip and the subsequent verification of the facts in that tip provided the officers the reasonable suspicion to stop the defendants' truck. The defendants argue that an anonymous tip in and of itself does not provide sufficient reasonable suspicion for officers to stop a vehicle. As the Supreme Court has noted, an anonymous tip standing alone would not warrant a man of reasonable caution in the belief that a stop was appropriate. *White* 496 U.S. at 329, 110 S.Ct. at 2416, (*citing Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). However, as the Court further observed, an anonymous tip coupled with in-

dependent corroboration by the police of significant aspects of the informer's predictions may impart sufficient indicia of reliability to justify an investigatory stop of a suspect's car. *White,* 496 U.S. at 332, 110 S.Ct. at 2417.

When an anonymous tip contains a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to *future actions* of third parties ordinarily not easily predicted, the information will likely have the sufficient indicia of reliability to justify an investigatory stop. *White,* 496 U.S. at 332, 110 S.Ct. at 2417; *see also, Illinois v. Gates,* 462 U.S. 213, 245, 103 S.Ct. 2317, 2335–36, 76 L.Ed.2d 527 (1983). It is reasonable for the police to believe that a person with access to information about a person's future behavior is likely to also have access to reliable information about that individual's illegal activities. *White,* 496 U.S. at 332, 110 S.Ct. at 2417.

In *White,* the anonymous tip provided information regarding the defendants car, the approximate time of departure, and the destination of the defendant. *Id.* 496 U.S. at 327, 110 S.Ct. at 2414. Even though not all the details mentioned by the tipster were verified in that case, such as the name of the defendant and the precise apartment from which she left, the Supreme Court held that the independent corroboration by the police of most of the tipsters information satisfied the totality of the circumstances test. *Id.* 496 U.S. at 332, 110 S.Ct. at 2417.

In the present case, the tipster gave specific information regarding Hatch's vehicle, including make, color, width of tires, tint of windshield, and license tag numbers. The tipster also predicted the identity, race, gender and number of the occupants, the location, amount and quantity of the narcotics, and importantly, the defendants' destination. This last prediction about the defendants' destination is exactly the kind of future behavior which *White* and *Gates* said could only be known by those with reliable information.

Furthermore, the police verified all the information on Hatch's truck including the license tag numbers. Most importantly, the police visually identified Hatch as the driver

at a location approximately 1,300 miles away from the point of departure, Miami, Florida, at a time which would correlate with the departure time given in the tip. Therefore, given the quantity and quality of the information, and the officers' independent corroboration of the tipster's information, the court concludes that, in light of the totality of the circumstances, the police had reasonable suspicion to make an investigatory stop of Hatch and Cooper.

The court finds, and the government does not dispute that the information provided by the tipster, and the independent corroboration by the police, did not furnish the officers with probable cause at the time of the stop.[11] Thus, upon initiation of the stop, the officers could perform a limited investigatory stop, but could not make an arrest. Therefore, based on the foregoing, under these circumstances the officers had a particularized and objective basis to make an investigatory stop.

### The Impact of the Officers Drawing Their Weapons

■ Given that at the time the officers stopped Hatch and Cooper, the police had reasonable suspicion to stop, but not probable cause to arrest the defendants, the court now turns to the second issue of whether the officers made a limited investigatory stop or whether the defendants were subjected to such a show of force that the stop was in fact an arrest. Hatch and Cooper argue that even if the officers' stop of Hatch's truck was supported by reasonable suspicion, the officers' conduct went beyond the brief investigatory stop that *Terry* permits. They contend that an arrest without probable cause occurred when the four officers drew their weapons and pointed them at Hatch. The government, however, argues that the officers' stop of the defendants was temporary, lasting no longer than necessary, was by means of least intrusion, and was not transformed into an arrest by the fact that the officers drew their weapons. Accordingly, the court must determine "whether the officer's actions were reasonably related in scope to the circumstances surrounding the

*Terry* stop." *Ocampo*, 890 F.2d at 1368. In light of the facts of this case, this is a close question.

■ Since an investigatory stop is based upon less than probable cause, its scope must be limited, it must be temporary—lasting no longer than necessary, and it must employ the least intrusive means reasonably available to promptly verify or dispel the suspicion. *United States v. Teslim*, 869 F.2d 316, 322 (7th Cir.1989) (citing, *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983)). The Seventh Circuit has indicated that the proper test for determining whether a given encounter rises to the level of a fourth amendment seizure is "if, in the totality of the circumstances, a reasonable person would not believe that his freedom of movement is restrained, or believes that he remains at liberty to disregard a police officer's request for information, a seizure has not occurred." *Edwards*, 898 F.2d at 1276. An arrest has occurred when "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In *United States v. Borys*, 766 F.2d 304 (7th Cir.1985), *cert. denied* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986), the Seventh Circuit set forth three factors relevant for determining whether a reasonable person would feel free to leave and disregard a police officer's request for information: (1) the conduct of the police; (2) the person of the individual citizen; and (3) the physical surroundings of the encounter. *See also United States v. Novak*, 870 F.2d 1345 (7th Cir.1991).

However, even given these guidelines, courts have been unable to develop a bright-line test to determine when, given the "endless variation in facts and circumstances," police-citizen encounters exceed the bounds of mere investigative stops. *Ocampo*, 890 F.2d at 1368–69 (quoting, *Florida v. Royer*, 460 U.S. at 506–07, 103 S.Ct. at 1329). The Supreme Court, and the Seventh Circuit, as

---

**11.** In fact, the case Agent, McGauley, testified that he knew at the time that the officers stopped Hatch and Cooper, that the officers did not have probable cause to arrest the suspects.

well as other courts have agreed that depending upon the facts of each case, an officer can point a gun at a suspect without automatically transforming an investigatory *Terry* stop into an arrest. *See United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985); *Ocampo,* 890 F.2d at 1369; and *Serna–Barreto,* 842 F.2d at 968.

In *Hensley,* the Supreme Court briefly commented that when a police officer had his gun drawn and pointed in the air while approaching the car of an armed robbery suspect who was reported to be armed and dangerous, the officer's conduct was reasonable and did not transform the *Terry* stop into an arrest. *Hensley,* 469 U.S. at 235, 105 S.Ct. at 684. There, the court concentrated on the fact that the suspect was reported to be armed and dangerous, in ruling that police officers are

> authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the [*Terry*] stop. The ... officers' conduct was well within the permissible range in the context of suspects who are reported to be armed and dangerous.

*Hensley,* 469 U.S. at 235, 105 S.Ct. at 683–684.

In *Ocampo,* the Seventh Circuit court agreed, and quoted *Hensley,* observing:

> In general, officers may take such steps as are "reasonably necessary to protect their personal safety and to maintain the status quo" so that the limited purposes of the stop may be achieved. *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). As indicated by the language in *Terry,* the question of whether a seizure is an investigatory stop or an arrest involves the determination of whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the circumstances at hand. *Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1878–79. In reviewing the officers' actions, we take note of the admonition that the "circumstances before [the officer] are not to be dissected and viewed singly; rather, they must be considered as a

whole." *United States v. Hall,* 525 F.2d 857, 859 (D.C.Cir.1976).

*Ocampo,* 890 F.2d at 1369.

The *Ocampo* panel then found that since there is no *per se* rule against the use of a weapon during an investigatory stop, the courts addressing the issue must be guided by the following general guideline: *"Whether the officer's actions were reasonably related in scope to the circumstances surrounding the Terry stop." Id.* 890 F.2d at 1368 (emphasis added); *see also United States v. Lechuga,* 925 F.2d 1035, 1039–1040 (7th Cir. 1991). The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day and the reaction of the suspect to the approach of the police are all facts which bear on the issue of reasonableness. *Ocampo,* 890 F.2d at 1369; *Serna–Barreto,* 842 F.2d at 967. In assessing the reasonableness of such police action, courts cannot be blind to "the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1881; *Ocampo* 890 F.2d at 1369. The police officer must be allowed "to pursue his investigation without fear of violence." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Ocampo* 890 F.2d at 1369.

In *Ocampo,* two law enforcement officers approached suspected drug traffickers who were believed to be carrying a large shipment of drugs. *Id.* 890 F.2d at 1369. The suspects were seated in a car and the officers did not have them in full view, and additionally, the officers observed Ocampo fumbling under the seat with an unseen object. *Id.* Under those circumstances, the Seventh Circuit held that the officers' conduct was not so intrusive and unreasonable as to transform an investigatory stop into an arrest when one officer pointed a gun at the suspect during his approach. *Id.* 890 F.2d at 1370.

In that case the court did note that the officers "show of force was highly intrusive and under some circumstances would certainly be tantamount to an arrest." *Id.* 890 F.2d at 1369. However, the court noted that the

fact that the police could have executed the stop without the use of a weapon does not make the stop unreasonable. *Id.* 890 F.2d at 1370. As the Supreme Court has recognized, "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973); *Ocampo,* 890 F.2d at 1370.

The Seventh Circuit also addressed the distinction between a stop and an arrest in the context of drawn guns in *Serna–Barreto:*

> The distinction between a stop and an arrest is one of degree, so it is not surprising that the courts have had difficulty in coming up with a bright-line test. Instead they have tended to follow the laundry-list approach, well illustrated by the list (not exhaustive) of factors (all relevant, none decisive, and no indication of how to weigh or compare them) in *United States v. White,* 648 F.2d 29, 34 (D.C.Cir.1981): officer's intent, impression conveyed, length of stop, questions asked, search made. Length of time seems the most important consideration in deciding whether a restraint is a mere stop or a full-fledged arrest, because it is a direct measure of the degree to which the citizen's freedom of action has been interfered with. But it cannot be the only factor. Remember that we are trying to balance the individual's interest in being left alone by the police with the community's interest in effective enforcement of the criminal laws.

*Serna–Barreto,* 842 F.2d at 966.

In *Serna–Barreto,* the court held that an illegal arrest had not occurred because the conduct of the police officers was reasonable under the circumstances. *Id.* 842 F.2d at 968. There, the officer pointed his gun at Serna–Barreto when he ordered her out of a car. *Id.* 842 F.2d at 966. The court ruled that this was a lawful stop because: the encounter occurred at night; the officers had reasonable suspicion that the suspects were involved in narcotics offenses; many drug traffickers are armed and they sometimes shoot policemen; the officer pointed his gun to protect himself; the suspects outnum-

bered the officers; the suspects were seated in a car and thus were not in full view of the approaching officer; and finally, Serna–Barreto testified that she was not scared by the gun. *Id.* 842 F.2d at 967–968. The court of appeals further commented:

> The significance of the pointed gun is that it makes the encounter far more frightening than if the officer's gun remains holstered, or even drawn but pointed down at his side; and certainly where the danger of the encounter to the officer, though potentially serious, is not clear and present, the deliberate pointing of a gun at the suspect is problematic. *See United States v. White,* supra, 648 F.2d at 34 n. 27. It would be a sad day for the people of the United States if police had carte blanche to point a gun at each and every person of whom they had an "articulable suspicion" of engaging in criminal activity.
>
> \*    \*    \*    \*    \*    \*
>
> Although we are troubled by the thought of allowing policemen to stop people at the point of a gun when probable cause to arrest is lacking, we are unwilling to hold that an investigative stop is never lawful when it can be effectuated safely only in that manner. It is not nice to have a gun pointed at you by a policeman but it is worse to have a gun pointed at you by a criminal, so there is a complex tradeoff involved in any proposal to reduce (or increase) the permissible scope of investigatory stops. We need not decide in this case just how great that scope should be, though clearly we are near the outer edge.

*Serna–Barreto,* 842 F.2d at 967–968.

However, in *United States v. Novak,* 870 F.2d 1345 (7th Cir.1991), the court of appeals reviewed another "show of force" case and determined that an investigatory stop had turned into a full-fledged warrantless arrest. There, upon reasonable suspicion provided by an informant's tip, a group of six to nine law enforcement officers stopped Novak and Leon, the two suspects, in a lighted public place at the Milwaukee airport. The two were suspected of bringing cocaine into Milwaukee on a flight from Miami. The suspects, who were not otherwise believed to be

armed or dangerous, were stopped in an enclosed airport walkway, offered no resistance, and made no suspicious moves, yet at least three officers drew and pointed their weapons at suspect Leon. One officer drew her weapon and pointed it at Leon's head at close range. There, the court of appeals held: .

> There was no justification for pointing a gun at Leon whom they had no intent to arrest at that time. In our judgment the encounter quickly constituted a full-fledged but warrantless arrest without probable cause. It would be surprising if under those circumstances Leon had felt free to leave. .

The *Novak* court did not comment on, or appear to take into account the fact that drug dealers are often armed and pose a danger to police, as did the panels in *Serna–Barreto* and *Ocampo, supra,* and as did the panel in *Lechuga,* 925 F.2d at 1039. Furthermore, *Novak* pre-dated *Ocampo,* and the *Novak* court did not employ the now-routine analysis of determining whether the officers' actions were reasonable under the circumstances.

In *Lechuga,* one of the two police officers who approached the suspected cocaine trafficker's vehicle had his weapon drawn, although it was pointed at the ground. *Id.* 925 F.2d at 1039. The Seventh Circuit panel analyzed that case by noting:

> One important circumstance to be considered is whether the show of force by police exceeded that reasonably necessary for their protection, a criterion which balances "the need for law enforcement officers to protect themselves ... in situations where they may lack probable cause for arrest," *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879, with the severe intrusion that a motorist feels when he is pulled over and approached by police with their weapons in full view or even pointed at him. Where the suspect is thought to be armed, or even when he is thought to be involved in criminal activity in which the use of weapons is a commonplace, police may protect themselves by displaying their weapons. Allowing police ready access to their weapons in these circumstances is an unfortunate but

necessary accommodation between the interests protected by the Fourth Amendment and the fact that "[i]nvestigative detentions involving suspects in vehicles are fraught with danger to police officers." *Michigan v. Long,* 463 U.S. 1032, 1047, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983). Other factors "which bear on the issue of reasonableness" are whether the stop was no longer than necessary to "confirm or dispel" the officer's suspicions, *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), "the location of the stop, the time of day and the reaction of the suspect to the approach of police...." *Ocampo,* 890 F.2d at 1369.

*Lechuga,* 925 F.2d at 1039.

The *Lechuga* court noted that the degree of intrusion into the suspect's personal security must be reasonably related in scope to the circumstances of the stop. *Id.* The panel specifically noted that an expansive range of police conduct is acceptable as long as the conduct is reasonably related to the circumstances at hand: "[A] motorist can be subjected to a broad range of undeniably intrusive police conduct based on no more than a police officer's reasonable suspicion that he is engaged in crime." *Id.* 925 F.2d at 1039–1040 (*citing Ocampo,* 890 F.2d at 1363). The expansive range of measures that law enforcement officers may take without transforming *Terry* stops into arrests include: allowing the use of drawn weapons during these encounters; allowing the police to block the suspect's vehicle in order to effectuate the stop; allowing the police to order a suspect to lie down on the ground; allowing the police to handcuff the suspect; allowing the police to detain suspects for extended periods while the police check for outstanding warrants. *Lechuga,* 925 F.2d at 1039 (citations omitted).

A number of other cases within and without the Seventh Circuit have addressed the question of whether the use of a drawn gun in connection with an investigatory stop converts the stop into an arrest. *See United States v. Chaidez,* 919 F.2d 1193 (7th Cir. 1990), *cert. denied* —— U.S. ——, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991) (not an arrest

but "at the outer edge of investigatory stops" when two police vehicles surrounded the defendant and five officers approached with their guns drawn, but pointed downward); *United States v. Merritt*, 695 F.2d 1263 (10th Cir.1982), *cert. denied* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983) (leveling of shotgun at defendant throughout the incident and order to "freeze" was not unreasonable police conduct under the circumstances given that the police were searching in the middle of the night for a murder suspect reported to be armed and dangerous); *United States v. White*, 648 F.2d 29 (D.C.Cir.1981), *cert. denied* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 235, 70 L.Ed.2d 233 (1981) (police officers' having their guns drawn but at their side and issuing orders to suspected narcotics traffickers at night to get out of vehicle for questioning did not convert investigatory stop of suspects into arrest); *United States v. Jones*, 759 F.2d 633 (8th Cir.1985), *cert. denied* 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985) (brief show of guns was permissible under *Terry* when two police officers blocked the suspected burglar's car and approached the suspect with their guns drawn); and *United States v. Ceballos*, 654 F.2d 177 (2nd Cir. 1981) (blocking of defendant's car and approach of officers with guns drawn did not fit within the narrow exception developed to general rule requiring probable cause for arrest, there being an arrest at moment when progress of car was blocked and defendant was faced by officers with their guns drawn and ordered out of his car).[12]

In *United States v. Strickler*, 490 F.2d 378, 380 (9th Cir.1974), the Ninth Circuit held that the use of guns automatically turns a stop into an arrest. However, this "per se" view has been strongly rejected by the Seventh Circuit and most other circuit courts who have addressed this issue. *See Serna–Barreto*, 842 F.2d at 968; *see also Ocampo*, 890 F.2d at 1369. In fact, in *United States v. Alvarez*, 899 F.2d 833, 839 (9th Cir.1990), *cert. denied* 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 663 (1991), the Ninth Circuit backed away from the *per se* view, holding that when three officers approached the suspect's vehicle with their weapons drawn, they reasonably feared for their safety, and "the manner of the stop did not convert the investigatory stop into an arrest."

In the present case, if the defendants felt as if they were not free to leave while the officers' weapons were drawn, that aspect of the stop lasted only for a few only moments. The defendants, suspected drug traffickers, were believed to be delivering five kilograms of cocaine from Miami to Fort Wayne when they were stopped just a few miles from their destination. When Trooper Knox pulled Hatch's truck over, Hatch promptly jumped out of his truck and started coming toward Knox. Knox immediately directed Hatch to get back into the truck; however, Hatch continued to advance toward Trooper Knox. Instantaneously, Knox responded by drawing his weapon, and ordering Hatch to return to the truck and to place his hands on the truck dashboard. When asked why he perceived this as a threatening incident, Trooper Knox testified that he drew his weapon on Hatch because, "I verbally had told the individual [Hatch] to get back in the vehicle and [yet] he proceeded to walk back towards me."

The three other officers near the truck, Officer Haxby, Agent Kell and Trooper Eidam, also sensed that Knox was threatened, and promptly drew their weapons, directing

---

**12.** In *Ocampo*, 890 F.2d at 1369, the court cited the following cases from other circuits which have agreed that an officer can point a gun at a suspect without transforming an investigatory stop into an arrest: *United States v. White*, 648 F.2d 29 (D.C.Cir.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981); *United States v. Trullo*, 809 F.2d 108 (1st Cir.1987), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1988); *United States v. Harley*, 682 F.2d 398, 400–402 (2d Cir.1982); *United States v. Manbeck*, 744 F.2d 360, 377 (4th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985); *United States v. Hardnett*, 804 F.2d 353 (6th Cir.1986), cert. denied, 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987); *United States v. Eisenberg*, 807 F.2d 1446 (8th Cir.1986); *United States v. Jones*, 759 F.2d 633 (8th Cir.1985), cert. denied, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1986); *United States v. Merritt*, 695 F.2d 1263, 1272–1274 (10th Cir.1982), cert. denied, 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983); *United States v. Aldridge*, 719 F.2d 368 (11th Cir.1983); *United States v. Pantoja–Soto*, 768 F.2d 1235 (11th Cir. 1985).

Hatch to comply with Knox's order.[13] It was not unreasonable for these law enforcement officers to construe Hatch's leaving the truck and coming toward Trooper Knox as a possibly threatening gesture, especially when coupled with the fact that Hatch did not comply with Knox's initial directive to step back into the truck. At the time he pulled Hatch and Cooper over, Trooper Knox did not have his gun drawn; in fact, none of the officers had their weapons drawn until Hatch made the threatening gesture towards Trooper Knox. After Hatch returned back to the truck, the officers promptly put their weapons away. This show of force was fleeting, lasting only the few seconds it took to convince Hatch to return to his truck so that the officers' immediate self-preservation anxieties could be calmed.

The leveling of three or four [14] revolvers is undeniably forceful police conduct, and under some circumstances, would be indistinguishable from an arrest. Yet, as *Ocampo, supra* instructs, such police conduct, if justified under the circumstances, is quite permissible in a *Terry* stop. Hatch and Cooper were suspected of being cocaine traffickers, criminal activity in which the use of weapons is commonplace. "It is beyond dispute that drug traffickers are often armed and dangerous and that 'they sometimes shoot policemen.'" *Ocampo*, 890 F.2d at 1369 (*quoting Serna–Barreto*, 842 F.2d at 967). Given the circumstances at hand, the officers were reasonably concerned for their own safety before they stopped the defendants. When Trooper Knox pulled Hatch over, Hatch immediately got out of his truck and advanced toward Trooper Knox, intensifying the Trooper's sense of danger. Then Hatch further exacerbated that sense of danger by failing to immediately return to the truck upon Knox's command.

After analyzing all the circumstances surrounding the seizure of the defendants here, the court does not find the officers' show of force so unreasonably intrusive as to constitute an arrest. Reviewing the situation through the eyes of reasonable and cautious police officers on the scene, the court cannot say that the officers acted unreasonably in responding to Hatch's movements by being prepared for possible violence. The officers could have reasonably believed that the precaution of drawing their weapons was necessary to protect themselves. After convincing Hatch to get back into the truck, the officers quickly put their weapons away. The show of force was no longer than necessary to dispel the officers' reasonable concern for their safety. The police conduct of giving directives to the defendants in a command tone while drawing and aiming four weapons at Hatch in an effort to protect themselves was not an unreasonable reaction under the circumstances.[15] Therefore, the officers' limited use of their weapons was a reasonable precaution in the context of this investigatory stop; the officers' actions were reasonably related in scope to the circumstances which presented themselves at that time.

### Consent to Search

The defendants also challenge the validity of Hatch's consent to the search of Hatch's truck, and challenge Cooper's alleged incriminating statements. Hatch claims that his consent "was not knowingly, voluntarily, and intentionally given." He argues that he has only a third grade education and is illiterate, and thus, was unable to understand the consent form. Cooper claims that he did not make any incriminating statements to the officers. The government contends that Hatch's consent to the search of his truck was valid, and that Cooper volun-

---

13. Troopers Knox and Eidam did testify that they used their guns and "command tone" not only for their own protection, but to assert their authority over the defendants. Yet, this is really the same thing: the officers were demanding compliance for the limited purpose of securing their own safety.

14. Officer Haxby testified that he was aiming at the ground between himself and the defendant.

15. Furthermore, although the officers surrounded Hatch's truck with their police vehicles quickly after the stop, and although the officers drew their weapons during this encounter, the officers did not order the defendants to lie down on the ground, nor did they handcuff the defendants, nor detain the defendants for an extended period to perform some peripheral task such as checking for outstanding warrants. *See Lechuga*, 925 F.2d at 1039.

tarily provided the officers with further information regarding Hatch's and Cooper's drug trafficking.

Generally, a warrantless search is per se unreasonable, and runs afoul of the Fourth Amendment unless the search conforms to certain specified exceptions. *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978). In some circumstances "the public interest is such that neither a warrant or probable cause is required" to conduct a search. *Maryland v. Buie,* 494 U.S. 325, 331, 110 S.Ct. 1093, 1097, 108 L.Ed.2d 276 (1990). Among those circumstances is the consent search, where, if the suspect validly waives the Fourth Amendment right, the search may be conducted without probable cause or warrant, *Florida v. Jimeno,* —— U.S. ——, ——, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991); *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–2044, 36 L.Ed.2d 854 (1973). In a consent search, the permission to search need only be free and voluntary, and need not be knowing and intelligent. *Schneckloth v. Bustamonte,* 412 U.S. at 248–249, 93 S.Ct. at 2059. The question of voluntariness of the consent is a factual issue to be resolved in light of "the totality of all the circumstances." *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980).

After being sure of their safety, the officers frisked the defendants and separated them. Because of the wind and weather, and due to the passing traffic on the four-lane highway, Cooper was asked to follow Agent McGauley to McGauley's vehicle to discuss the purpose of the stop. In McGauley's vehicle Cooper engaged in his discussion with the officers, after being repeatedly told that he was free to go and that he need not answer any of the officers questions. Cooper was not illegally detained during this questioning. The officers unequivocally maintain that Cooper was advised of his rights and verbally consented to discuss the purpose of the stop with them. Despite his testimony to the contrary, in an abundance of caution, Agent McGauley timely warned Cooper of his *Miranda* rights. *See supra,* n. 7. This questioning was permissible within the scope of a *Terry* stop, *supra.*[16]

During the conversation between McGauley and Cooper in McGauley's vehicle, Cooper initially denied knowledge of any narcotics being in the truck. Subsequently, however, Cooper admitted that there were "two kilos" in a suitcase behind the driver's seat in Hatch's truck. This admission is denied by Cooper, but has been substantiated by the testimony of Agent McGauley, Agent Kell and Officer Haxby. After weighing the evidence and observing the witnesses, the court determines that Cooper made this voluntary admission.

The officers then approached Hatch, who was waiting near Trooper Knox's police vehicle. McGauley unequivocally maintains that he then told Hatch that he was free to go and that he was not under arrest. After McGauley told Hatch of the purpose of the stop, Hatch claimed he had no knowledge of any cocaine located in his truck, and verbally consented to the search of his truck. In addition to verbal consent, Hatch was then likewise asked to sign a written consent form at that time. In response, Hatch indicated that he would, but because of his limited education, he could not read or write very well. McGauley then carefully read the con-

16. The *Miranda* warnings regarding a suspect's Constitutional rights must be administered to a suspect prior to custodial interrogation. *United States v. Fazio,* 914 F.2d 950, 954 (7th Cir.1990); *Rhode Island v. Innis,* 446 U.S. 291, 300–301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). In order to show a "custodial relationship" which would require administration of the *Miranda* warnings, the defendant must show he was formally arrested or that his freedom of movement was restricted to the degree associated with formal arrest. *Fazio,* at 955; *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). In determining whether a suspect's freedom of movement was restricted to the degree associated with arrest, the court considers the totality of the circumstances, and employs an objective analysis. *United States v. Lennick,* 917 F.2d 974, 977 (7th Cir.1990). "[T]he test is not whether the defendant was under a subjective belief that his or her movements were restricted, but whether a reasonable person in the defendant's position would believe that he or she was free to leave." *Lennick,* at 977. The court finds that Cooper was not subjected to arrest or the functional equivalent of arrest before Agent McGauley warned Cooper of his rights pursuant to *Miranda.*

sent form to Hatch, line by line. Hatch stated that he understood the form, and then Hatch signed the same. This written consent occurred just three-to-eight minutes after the initial stop was made.

The officers then conducted the search and found the two "kilo"-size packages behind the drivers seat in Hatch's truck. The packages were later determined to contain cocaine and $23,000 in United States currency.

■ As the court has found, *supra,* Hatch was not under arrest when he gave the officers consent to search his truck—Hatch and Cooper were arrested only after the two packages of suspected cocaine were discovered in the baggage behind the truck seat.[17] Although Hatch claims his consent was not given knowingly or intelligently, in a consensual search, the permission to search need not be knowing and intelligent, rather all that is required is that the consent is freely and voluntarily given. *Schneckloth,* 412 U.S. at 248–249, 93 S.Ct. at 2059.

In light of all circumstances, and after hearing the evidence and weighing the credibility of the witnesses, the court finds that Cooper voluntarily told the officers that there was cocaine in the truck, and that Hatch did in fact give his verbal and written voluntary consent to a search of the truck before the detectives discovered the two packages of suspected cocaine. Hatch and Cooper validly waived their Fourth Amendment rights, and the search was, therefore, properly conducted without probable cause or warrant. *See, Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041.

## CONCLUSION

For the foregoing reasons, the defendant's motion to suppress evidence is DENIED.

---

**17.** At the time Hatch gave his consent to the search of his truck, he and Cooper probably could have been arrested. Cooper's statement that there were "two kilos" behind the seat would have furnished the officers with sufficient probable cause to arrest the suspects.